**In re Mary Kay McNICHOLS, Debtor.**

No. 99 B 18053.

United States Bankruptcy Court,
N.D.Illinois,
Eastern Division.

May 25, 2000.

Arthur G. Jaros, Jr., Richter, Jaros & Robinson, Oak Brook, IL, for Debtor.

Barry A. Chatz, Steven J. Christenholz, Miriam R. Stein, Kamensky & Rubinstein, Lincolnwood, IL, Francis X. Buckley, Jr., Thompson Coburn, LLP, St. Louis, MO, for Equity Insurance Managers, LLC.

Glenn Stearns, Lisle, IL, Chapter 13 Standing Trustee.

Gerald Mylander, Office of Glenn Stearns, Chapter 13 Standing Trustee, Lisle, IL, for Trustee.

### MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court for confirmation of the second amended plan filed by Mary Kay McNichols (the "Debtor") and on the objections to confirmation and motions to dismiss filed by Glenn Stearns, the Standing Chapter 13 Trustee assigned to this case (the "Trustee"), and Equity Insurance Managers, LLC ("Equity"). For the reasons set forth below, the Court sustains, in part, the Trustee's objection to confirmation of the plan, but reserves ruling on his motion to dismiss. In addition, the Court sustains, in part, Equity's objection to confirmation, but reserves ruling on its motion to dismiss. The Debtor is given fourteen days to file a third amended plan. If a plan is not filed, the case shall be dismissed. If a plan is filed, the continued confirmation hearing will be held on July 14, 2000 at 11:00 a.m. in Courtroom 2000, 505 North County Farm Road, Wheaton, Illinois.

### I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain these matters pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. They are core proceedings under 28 U.S.C. § 157(b)(2)(A), (L) and (O).

### II. FACTS AND BACKGROUND

The Debtor was an employee of Equity pursuant to an employment agreement entered into by Equity and the Debtor on January 1, 1997. Equity claims that on February 4, 1998, the Debtor breached that employment agreement. The parties agreed to arbitrate their disputes, and pursuant to that arbitration, the Debtor was found to have breached the employment agreement. Equity was awarded $91,-000.00 in damages, plus costs in the amount of $986.66. On April 22, 1999, the Circuit Court of Cook County, Illinois, entered a judgment on the arbitration award in the amount of $91,000.00, plus costs, in favor of Equity and against the Debtor. On May 6, 1999, the Debtor filed a motion to reconsider, which was denied on May 18, 1999. Equity recorded a memorandum of its judgment thereby encumbering the marital home co-owned by the Debtor and her spouse. Equity's post-judgment collection action precipitated the filing of the Debtor's Chapter 13 petition. The Trustee and the Debtor have stipulated that the Debtor's spouse has no personal liability for the $91,000.00 arbitration award and judgment. The Debtor's spouse has not filed a bankruptcy petition.

The Debtor filed her Chapter 13 petition on June 7, 1999. On August 6, 1999, she filed a notice of appeal of the state court judgment. On January 7, 2000, the Debtor filed a proof of claim on Equity's behalf indicating that Equity was entitled to a secured claim in the amount of $44,500.00.[1] The Debtor then objected to the claim on the basis that it is not valid because the Debtor filed an appeal of the judgment underlying the claim. The Debtor subsequently withdrew its objection to Equity's claim without prejudice. Equity filed an amended proof of claim asserting a se-

1. The amount of the proof of claim filed by the Debtor on behalf of Equity was calculated by subtracting the unpaid amount of the first mortgage on the marital home from the fair market value of the property, dividing the remaining equity in the residence by two, and then subtracting the Debtor's Illinois home- stead exemption ($285,000—$181,000 ÷ 2— $7,500 = $44,500). See Debtor's Post–Trial Memorandum in Support of Confirmation of the Second Amended Plan, p. 4. The Court notes that Equity filed a secured claim in that amount on March 1, 2000, which is deemed allowed.

cured component totaling $44,500.00 and an unsecured component of $47,486.66.

The Debtor is a married woman, gainfully employed outside of the home, living with her working spouse and their two dependent teenaged children. The Debtor's second amended plan (the "Plan") proposes to make monthly payments of $1,881.00 to the Trustee for thirty-six months or a total of $67,716.00.[2]

The Debtor proposes to pay "outside" of the Plan (more accurately stated to pay "directly," rather than through Plan payments made to the Trustee) National City Mortgage, a fully secured creditor via a first mortgage on the Debtor's residence, Oak Brook Bank, an under secured creditor via a purchase money security interest in a 1998 Volkswagon automobile, and First Union Home Equity Bank N.A. n/k/a First Union Mortgage Corporation ("First Union"), a junior mortgage creditor, included as a secured claim in the Debtor's petition and schedules.[3]

Other pertinent parts of the Debtor's Plan call for disbursement of monies in the following order: (1) first, under Paragraph 2(a) to any priority claimants, including counsel for the Debtor, until paid in full (these amount to an estimated $4,469.26 in Chapter 13 Trustee's fees at 6.6 % of Plan payments and an estimated $22,000.00 for the Debtor's attorney's fees); (2) second, under Paragraph 2(b) to the secured claim of Aetna Life Insurance Company, as Trustee on a 401(k) plan loan until paid in full (Aetna's filed proof of claim was for $22,769.06); (3) third, under Paragraph 2(c)(ii) to the general unsecured creditors pro rata to the extent of $9,000.00; (4) fourth, under Paragraph 2(c)(iii) to the unsecured creditors whose claims have a co-debtor until those claims have been paid in full (only one creditor fits this category, the Debtor's spouse, whose filed claim was for $7,988.50); and (5) finally, under Paragraph 2(c)(iv) to Equity on its secured claim of $44,500.00.

From the above analysis, it is undisputed that the Debtor's monthly Plan payments are insufficient to pay any money to Equity over the three year life of the Plan until the last month of the Plan term.[4] Thus, the Debtor proposes in the last month of the Plan term to make a lump sum payment to Equity pursuant to 11 U.S.C. § 1322(b)(8) by withdrawing funds from her otherwise exempt 401(k) plan and waiving her exemption as to that portion of the account.

The Debtor's amended Schedule I shows that the Debtor earns approximately 40% of the household's net take home pay or $5,117.13 per month, and the nondebtor spouse earns approximately 60% of the household's net take home pay or $7,469.00

2. The total amount to be paid into the Plan each month includes a $824.00 monthly payment to Aetna Life Insurance Company, as Trustee on its secured 401(k) loan claim.

3. Although not completely clear, the Trustee argues, and the Debtor does not disagree, that

Equity's judgment lien was recorded on April 22, 1999, prior to First Union's junior mortgage, which was recorded on May 10, 1999 as shown by its proof of claim, which may render First Union's claim either under secured or possibly wholly unsecured.

4. Plan Payments: $1,881.00 × 36 months = $67,716.00

Plan Disbursements:

| Paragraph 2(a) | $ 4,469.26 | |
|---|---|---|
| | 22,000.00 | (estimated attorney's fees) |
| Paragraph 2(b) | 22,769.06 | |
| Paragraph 2(c)(ii) | 9,000.00 | |
| Paragraph 2(c)(iii) | + 7,988.50 | |
| | $66,226.82 | |

($67,716.00 − $66,226.82 = $1,489.18 which is less than one month's Plan payment)

per month. Their combined monthly net incomes total $12,586.13. The Debtor testified that she is employed full-time in the insurance industry and has worked in that industry for many years. The Debtor's amended Schedule J shows combined monthly expenses for the family of $10,462.00.[5] The Debtor contends that she

5. The Debtor's amended Schedule J provides in relevant part:

| AMENDED SCHEDULE J—CURRENT EXPENDITURES OF INDIVIDUAL DEBTOR(S) | Debtor | Nondebtor Husband | Combined |
|---|---|---|---|
| Rent or home mortgage payment | $1,628.00 | $1,627.00 | $3,255.00 |
| Utilities: Electricity and heating fuel | 125.00 | 125.00 | 250.00 |
| Water and sewer | 20.00 | 20.00 | 40.00 |
| Telephone | 90.00 | 90.00 | 180.00 |
| Other: Cell Phone | 65.00 | 50.00 | 115.00 |
| Home Maintenance (repairs and upkeep) | 25.00 | 25.00 | 50.00 |
| Food | 275.00 | 895.00 | 1,170.00 |
| Clothing | 50.00 | 360.00 | 410.00 |
| Laundry and dry cleaning | 35.00 | 365.00 | 400.00 |
| Medical and dental expenses | 60.00 | 385.00 | 445.00 |
| Transportation (not including car payment) | 153.00 | 153.00 | 306.00 |
| Recreation clubs and entertainment, newspapers, magazines, etc. | 77.50 | 641.50 | 719.00 |
| Charitable contributions | 65.00 | 65.00 | 130.00 |
| Insurance (not deductible from wages or included in home mortgage payments): | | | |
| Homeowner's or renter's | 0.00 | 0.00 | 0.00 |
| Life | 56.10 | 113.90 | 170.00 |
| Health | 0.00 | 0.00 | 0.00 |
| Auto | 0.00 | 0.00 | 0.00 |
| Other: Car and Home Insurance | 85.00 | 85.00 | 170.00 |
| Taxes: (not deducted from wages or included in home mortgage payments) Real Estates Taxes | 200.00 | 200.00 | 400.00 |
| Installment payments: (In chapter 12 and 13 cases, do not list payments to be included in the plan) | | | |
| Auto | 206.50 | 206.50 | 413.00 |
| 401K Plan Secured Loan Repayment | 824.00 | 0.00 | 824.00 |
| Other: Music Lessons for Children | 0.00 | 310.00 | 310.00 |
| See Schedule Attached (*see below) | 20.00 | 685.00 | 705.00 |
| TOTAL MONTHLY EXPENSES | $4,060.10 | $6,401.90 | $10,462.00 |
| **FOR CHAPTER 12 AND 13 DEBTOR(S) ONLY** | Debtor | Nondebtor Husband | Combined |
| A. Total projected monthly income | 5,117.13 | 7,469.00 | 12,586.13 |
| B. Total projected monthly expenses | 4,060.10 | 6,401.90 | 10,462.00 |
| C. Excess income (A minus B) | 1,057.03 | 1,067.13 | 2,124.13 |
| D. Total amount to be paid into plan each month | $1,057.03 | –0– | $ 1,057.03 |
| **\*SCHEDULE** | Debtor | Nondebtor Husband | Combined |
| Hairdresser–Husband | | 40.00 | 40.00 |
| Hairdresser–Debtor | | 60.00 | 60.00 |
| Hairdresser-child | | 60.00 | 60.00 |
| Hairdresser-child | | 25.00 | 25.00 |
| Manicure–Debtor | | 30.00 | 30.00 |
| Manicure-child | | 30.00 | 30.00 |
| Support of Debtor's Mother-in-law | | 100.00 | 100.00 |
| Housekeeper | | 140.00 | 140.00 |
| Newspaper | 10.00 | 10.00 | 20.00 |

carries only 33% of the household expenses while her spouse shoulders 67% of those expenses, even though he earns only 60% of the income. On her amended Schedule J, however, the Debtor has been allocated to pay 50% of the mortgage, real estate taxes and car loan payments as co-owner of the family residence and vehicle, and as a co-obligor on the secured indebtedness thereon as items to deduct from her net income in order to compute her disposable net income for Plan payments, while her spouse is paying varying amounts and percentages of other line items for the family.

The Trustee filed an objection to confirmation of the Debtor's Plan and a motion to dismiss the bankruptcy case pursuant to 11 U.S.C. § 1307(c). The Trustee raised the following grounds for objection to the Debtor's Plan: (1) the Debtor's amended Schedule J demonstrates that the Debtor has net disposable income of $2,948.12 (without clearly explaining how this amount was calculated); (2) Paragraph 2(c)(ii) and (iii) of the Plan unfairly classifies unsecured debts with a cosigner to be more favorably treated in that, pursuant to the amended Schedule J, the debtor's spouse has the ability to fund any amount that would not be paid in the Plan; (3) the $194.00 per month paid for the Debtor's vacation timeshare constitutes disposable income because maintenance of a timeshare is not reasonably necessary for the support of the Debtor and her dependents; (4) Paragraph 2(c)(iv) of the Plan, which purports to provide for direct payment to secured creditors as listed in Paragraph 4(b), fails to specifically designate which of

the creditors are affected by this provision; (5) Paragraph 6 of the Plan attempts to complete amounts due under the Plan by gifts and loans from relatives, which demonstrates that the Debtor does not have the ability to complete all payments under the Plan as required by 11 U.S.C. § 1325(a)(6); (6) Paragraph 8 of the Plan attempts to impermissibly modify the rights of the Trustee under 11 U.S.C. § 1329; and (7) pursuant to the amended Schedule J, the Debtor has the ability to propose a plan that provides 100% repayment to unsecured creditors.

On February 14, 2000, Equity filed an objection to confirmation and a motion to convert the Debtor's Chapter 13 case. Equity adopts the Trustee's objections. Equity contends that the Debtor's Plan cannot be confirmed for some of the same reasons raised by the Trustee: (1) the Plan violates 11 U.S.C. § 1322(b)(1) in that it unfairly discriminates against the claim of Equity as well as other general unsecured creditors; and (2) the Plan violates 11 U.S.C. § 1325(a)(6) and (b)(2) because the Debtor's ability to make all the payments proposed by the Plan is too uncertain and speculative, and she is not committing all of her disposable income while living an "extravagant lifestyle." The Court will address each objection in turn.

### III. DISCUSSION

#### A. Chapter 13 Confirmation Standards

■ Section 1325(a) of the Bankruptcy Code sets forth the requirements for confirmation of a Chapter 13 plan.[6] If an

| Christmas/B-day Gifts | | 10.00 | 190.00 | 200.00 |
|---|---|---|---|---|
| TOTALS | | $ 20.00 | $ 685.00 | $ 705.00 |

**6.** Section 1325(a) provides:
(a) Except as provided in subsection (b), the court shall confirm a plan if—
(1) the plan complies with the provisions of this chapter and with the other applicable provisions of this title;
(2) any fee, charge, or amount required under chapter 123 of title 28, or by the plan, to be paid before confirmation, has been paid;

(3) the plan has been proposed in good faith and not by any means forbidden by law;
(4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed secured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7

unsecured creditor or the Chapter 13 trustee objects to the plan, the Court may not confirm the plan unless unsecured claims are to be paid in full or all of the debtor's projected disposable income will be committed to the plan. 11 U.S.C. § 1325(b)(1). The party objecting to confirmation bears the initial burden of presenting evidence that the proposed plan does not include all disposable income, but the ultimate burden then shifts to the debtor to show compliance with the requirements of § 1325(b)(1)(B). *In re Ehret*, 238 B.R. 85, 87 (Bankr.D.N.J.1999) (citations omitted).

## B. *The Disposable Income Requirement*

The Court may not approve a Chapter 13 plan unless it satisfies the disposable income test of § 1325(b). Much of the parties' dispute focuses on whether this requirement has been met. In essence, the Trustee (and Equity) contend that the Debtor's budgeted monthly expenses have been inappropriately manipulated to allocate for the spouse to pay unnecessary luxury items for the family. The Debtor counters that her spouse's disposable income is not subject to the disposable income limits of § 1325(b) in that the spouse's income cannot be forced by the Trustee to be utilized to make Plan payments for the Debtor. Section 1325(b)(2), which defines disposable income, provides:

> For purposes of this subsection, "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—
>
> (A) for the maintenance or support of the debtor or a dependent of the debtor ...; and

(B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

11 U.S.C. § 1325(b)(2).

In order to satisfy this test as mandated by § 1325(b)(1)(B), the Debtor must commit to the Plan all her income that is not "reasonably necessary" for the support of the Debtor and her family dependents for three years. One court has interpreted the phrase "reasonably necessary" as one of "adequacy, supporting basic needs 'not related to [the debtor's] former status in society or the lifestyle to which he is accustomed....'" *In re Sutliff*, 79 B.R. 151, 157 (Bankr.N.D.N.Y.1987) (*quoting In re Jones*, 55 B.R. 462, 466–67 (Bankr.D.Minn. 1985)). "Debtors should not be allowed to continue in the lifestyle that drove them to file bankruptcy and at the expense of their creditors." *Id.* at 157 (citations omitted).

■ Generally, debtors may not maintain their pre-petition lifestyles at the expense of their creditors. *See Jones*, 55 B.R. at 464; *Sutliff*, 79 B.R. at 157; *In re Gillead*, 171 B.R. 886, 890 (Bankr.E.D.Cal. 1994). Reasonably necessary expenses are unrelated to the debtor's former lifestyle. *Id.* As one court noted, the debtor "cannot expect to go 'first class' when 'coach' is available." *In re Kitson*, 65 B.R. 615, 622 (Bankr.E.D.N.C.1986).

■ This test prohibits a debtor from proposing to pay for luxury items, investments and other unnecessary items at the expense of payments to unsecured creditors. Consequently, the disposable income requirement turns on whether a debtor's budgeted expenses are reasonably neces-

of this title on such date;
(5) with respect to each allowed secured claim provided for by the plan-
 (A) the holder of such claim has accepted the plan;
 (B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
 (ii) the value, as of the effective date of the plan, of property to be distributed

under the plan on account of such claim is not less than the allowed amount of such claim; or
 (C) the debtor surrenders the property securing such claim to such holder; and
(6) the debtor will be able to make all payments under the plan and to comply with the plan.
11 U.S.C. § 1325(a).

sary. *In re Reyes*, 106 B.R. 155, 158 (Bankr.N.D.Ill.1989). Determining what is "reasonably necessary" requires the Court to "engage in the unenviable task of scrutinizing the debtor's schedule of income and expenditures." *In re Johnson*, 241 B.R. 394, 398 (Bankr.E.D.Tex.1999). There is no bright line rule for determining what is "reasonably necessary." *In re Nicola*, 244 B.R. 795, 797 (Bankr.N.D.Ill.2000) (citation omitted). "Reasonably necessary" means adequate, but not first class, and luxury items are excluded. *Id. (citing Bolger v. Bolger (In re Bolger)*, Ch. 7 Case No. 97 B 14380, Adv. No. 97 A 00692, 1998 WL 351032 at *4 (Bankr.N.D.Ill. June 18, 1998)).

Moreover, several courts have held that a plan is not confirmable as payments for recreational items are not reasonably necessary for support or maintenance. *See In re Rybicki*, 138 B.R. 225 (Bankr.S.D.Ill. 1992). Moreover, sums expended by debtors to maintain a non-income producing vacation home are not reasonably necessary to their support and should be included in disposable income devoted to payments made under the plan. *In re Dick*, 222 B.R. 189, 191 (Bankr.D.Mass.1998).

■ To apply these standards to a married debtor who files individually, courts base their calculation of the debtor's disposable income on the debtor's family budget, including the income and expenses of the nondebtor spouse. *See In re Carter*, 205 B.R. 733, 735 (Bankr.E.D.Pa.1996) (citations omitted). The Court adheres to the view that a nondebtor spouse's income and expenses are to be taken into consideration when determining whether all of a debtor's disposable income is being applied to the plan. *See In re Bottorff*, 232 B.R. 171, 173 (Bankr.W.D.Mo.1999); *In re Ehret*, 238 B.R. 85, 88 (Bankr.D.N.J.1999); *In re Cardillo*, 170 B.R. 490, 491 (Bankr. D.N.H.1994); *In re Schnabel*, 153 B.R. 809, 818 (Bankr.N.D.Ill.1993); *In re Belt*, 106 B.R. 553, 563 (Bankr.N.D.Ind.1989); *In re Carbajal*, 73 B.R. 446, 447 (Bankr. S.D.Fla.1987).

■ "Consideration of the nondebtor spouse's income is seen as necessary because a portion of that spouse's income is likely to be applied to the basic needs of the debtor, potentially increasing the share of the debtor's own income that is not reasonably necessary for support." *Carter*, 205 B.R. at 736 (footnote omitted). As one source has noted:

Most courts include the debtor's spouse's income in the budget for purposes of calculating projected disposable income under § 1325(b) notwithstanding that the spouse is not a debtor in the Chapter 13 case. The theory is that the nonfiling spouse's income is available to defray the debtor's reasonably necessary expenses, thus freeing a larger portion of the debtor's separate income for satisfaction of unsecured claims. Creditors have argued successfully that it would be unfair to allow the debtor's separate income to be used for the family necessities and not count a nonfiling spouse's income that would remain "disposable" to the debtor and uncommitted to the plan. Section 1325(b)(2) is worded that disposable income means income "which is *received by the debtor* and which is not reasonably necessary ... for the maintenance or support of the debtor or a dependent of the debtor." Income to a nonfiling spouse is not necessarily "received by the debtor." However, to account for the portion of the debtor's income which is "not reasonably necessary ... for the maintenance or support of the debtor or a dependent of the debtor," it is appropriate to first use all of the nonfiling spouse's income to pay expenses, thus arriving at approximately the same mathematical calculation without the fiction that the spouse's separate income is "received by" the debtor. Either way the nonfiling spouse's income is accounted for to the benefit of creditors in the debtor's Chapter 13 case.

2 K. Lundin, *Chapter 13 Bankruptcy* § 5.35 at 5–96–5–97 (2d ed.1997) (footnotes

omitted). Moreover, the Official Bankruptcy Forms require a married debtor in Chapter 13 to report the income and expenses of herself and her spouse. *See* Official Form No. 6, Schedules I and J; *Carter*, 205 B.R. at 736. Debtors are required to follow the Official Forms pursuant to Federal Rule of Bankruptcy Procedure 1007(b)(1), which instruct debtors to file a schedule of current income and expenditures as prescribed by the Official Forms. Fed. R. Bankr.P. 1007(b)(1).

■ The family is a functioning unit, of which the Debtor is an integral and important member, and the totality of the family's income and expenses is appropriately considered in calculating both the disposable income of the Debtor for purposes of § 1325(b)(2) as well as the good faith requirement of § 1325(a)(3). The Court rejects the Debtor's argument that she is a separately operating economic unit. In fact, the trial testimony and documentary evidence showed she has, from time to time, both pre-petition and post-petition, paid family expense items allocated to be paid by her spouse, contrary to the family budget allocations reflected on her amended Schedule J.

## C. *The Trustee's Objections to the Debtor's Plan*

### 1. *The Debtor has not demonstrated that all disposable income is being committed to the Plan*

The Debtor has not satisfied her burden of demonstrating that all proper disposable income for § 1325(b)(2) purposes is being committed to the Plan. On this issue, the Court's principal focus is on the Debtor's expenditures on her amended Schedule J. The Trustee argues that some of these expenses are not necessary for her support. The Trustee claims that the Debtor is subsidizing various luxury and nonessential expenses of the family through the income of her spouse at the expense of her unsecured creditors. The Trustee maintains that the expenses listed on the Debtor's amended Schedule J are more than

adequate or necessary to reasonably support and maintain the Debtor, her spouse and their two children. There are, in addition, substantial luxuries budgeted which are not necessary for the reasonable support of the family. In this regard, the Court agrees with the Trustee. The Debtor and her family need to tighten their proverbial financial belt to meet both the disposable income test of § 1325(b)(2) and the good faith requirement of § 1325(a)(3). It is not for the Court to dictate an appropriate budget any more than it is for the Court to draft a Chapter 13 plan. Rather, the burden rests with the Debtor.

■ While a nondebtor spouse can understandably be expected to pay for certain family expenses in amounts greater than the Debtor, there is no compelling logic, as the Debtor argues, to have some reasonably necessary expenses paid 50/50 while others are borne by the spouse at a much higher percentage, especially the nonessential luxury items, such as vacation home, timeshare, housekeeper, hairdresser and manicure expenses. True enough, some of those items are purportedly to be paid for by the spouse from his income, but the Debtor has the direct or indirect benefit and enjoyment of same. It is not appropriate for the Debtor to "cherry pick" the family expense budget and have luxury items paid for through allocation to the nondebtor spouse so that the net effect is to maintain a luxurious lifestyle, but only pay a small dividend to unsecured creditors, pro rata from the $9,000.00 of the total Plan payments allocated under Paragraph 2(c)(ii).

■ The Court notes that based on a review of the expenses, the Debtor and her family are living a rather luxurious lifestyle compared to most Chapter 13 debtors in this Court. After all, the Debtor chose to file bankruptcy and expenses that are "reasonably necessary" are not necessarily those related to the pre-petition lifestyle to which the Debtor has become accustomed. *See Cardillo*, 170 B.R. at 491.

The luxuries that the Debtor enjoyed prior to filing bankruptcy should not be approved after filing when through the ploy of payments allocated to the spouse, the Plan proposes to pay only a very small fraction of the amounts owed to her unsecured creditors. The Debtor and her spouse have a combined income of approximately $150,000.00 per year. The Court finds that the annualized expenses for luxury, unnecessary items for § 1325(b) purposes such as music lessons at $3,720.00, recreation at $8,628.00, manicures at $720.00, hairdresser at $2,220.00, and a housekeeper at $1,680.00 are not reasonable or necessary given the small estimated dividend of approximately 10% to general unsecured creditors.[7]

The Court sustains the Trustee's objection to the Debtor's Plan on this ground. Some of the monthly expenses allocated to be paid by the spouse are excessive, to say the least, and truly unnecessary for the maintenance and support of the Debtor or her dependents. Moreover, the Debtor herself, directly or indirectly, benefits and receives some of the services for which the expenditures are made. A summary of some of those monthly expenses listed on amended Schedule J are as follows:

| | |
|---|---|
| Recreation | $641.50 |
| Hairdresser | $185.00 |
| Manicures | $ 60.00 |
| Housekeeper | $140.00 |
| Gifts | $200.00 |

 The § 1325(b)(2) definition of disposable income does not leave a debtor with unbridled discretion to carve out for himself and family whatever lifestyle they may choose. *In re Zaleski*, 216 B.R. 425, 431 (Bankr.D.N.D.1997). Section 1325(b) is to be applied in a way that allows a debtor to "maintain a reasonable lifestyle while simultaneously insuring that [he or she] makes a serious effort to fulfill [his or her] obligations to [pre-petition] creditors by eliminating unnecessary or unreasonable expenses." *Rybicki*, 138 B.R. at 226. (quotation omitted). As one court has aptly noted:

> The key term is "reasonable lifestyle." Debtors need not be reduced to poverty and granted, some discretionary or recreational spending is not inappropriate, but courts are loathe to favor kindly expenditures which are for luxury goods or serve to perpetuate a luxury lifestyle. Greater scrutiny of a debtor's proposed lifestyle and his budgetary components is required where, as here, a fairly high income Debtor is advancing a plan offering a niggling return to pre-petition creditors through a three-year plan.

*Zaleski*, 216 B.R. at 431.

A review of the Debtor's budget demonstrates that it is designed to perpetuate the family's opulent lifestyle in the face of a parsimonious payment to the unsecured creditors. The Court will not condone such a flagrant manipulation of the disposable income requirement by shifting many of those luxury expenses to the Debtor's spouse, especially where the Debtor directly enjoys the benefit of many of the luxury expenses.

The Court must take into account the impact that the nondebtor spouse's income and expenditures have on the family budget in considering the Debtor's disposable income. "The nondebtor spouse's income is included in the § 1325(b) analysis not because it is treated as statutorily defined income to the debtor but rather because consideration of that resource is necessary to an accurate assessment of the debtor's

7. The following is the list of unsecured claims as filed and deemed allowed:

| Creditor | Amount |
|---|---|
| Mario J. Parisi | $ 3,000.00 |
| American Arbitration Association | 2,377.50 |
| American Express Travel Related | 2,028.02 |
| American Express Centurion Bank | 7,551.82 |
| Discover Financial Services, Inc. | 9,436.99 |
| Citibank, N.A. | 7,665.99 |
| Citibank, N.A. | 6,923.12 |
| Equity's unsecured claim | 47,486.66 |
| Fleet Credit Card Services, L.P. | + 3,799.95 |
| **TOTAL** | **$90,270.05** |

($9,000.00 ÷ $90,270.05 = .0997 or approximately 10% )

budget." *Carter*, 205 B.R. at 736 n. 3. Failure to consider the impact of the non-debtor spouse's income and proposed expenditure therefrom would leave the debtor's unsecured creditors to subsidize the spouse's expenses. *See Carter*, 205 B.R. at 736; *Schnabel*, 153 B.R. at 818; *Belt*, 106 B.R. at 561–62. That is more accurately stated here to be in the nature of the pre-petition unsecured creditors receiving a small dividend, while the Debtor and her family live relatively "high on the hog" through payments out of the spouse's post-petition income.

The Debtor relies on *In re Harmon*, 118 B.R. 68 (Bankr.E.D.Mich.1990) and *In re Velis*, 123 B.R. 497 (D.N.J.), *aff'd in part and rev'd in part*, 949 F.2d 78 (3d Cir. 1991) for the proposition that family expenses are to be apportioned 50/50 if both spouses are employed and earning similar income amounts. The *Velis* case is distinguishable for several reasons. First, it was filed under Chapter 11, not Chapter 13. In addition, the *Velis* court was deciding an issue under 11 U.S.C. § 522(d). The court did not make any finding under § 1325(a)(2). Hence, that case is inapposite to the matter at bar and any dicta therein about apportioning allowable family expenses 50/50 between working spouses is not persuasive, especially in instances where the spouses' incomes are not relatively equal.

In the *Harmon* case, the trustee objected to the debtor's plan on the grounds that it failed to provide for all of the debtor's net disposable income under § 1325(b)(1)(B). 118 B.R. at 69. The debtor was married to a working woman who did not file bankruptcy. *Id.* Before the bankruptcy filing, they split their living expenses equally. *Id.* The debtor's budget proposed to calculate his net disposable income by deducting one-half of the total family expenses from his after-tax income. *Id.* The *Harmon* court found that the agreement between the debtor and his wife to share their expenses equally was an established aspect of their marriage

before his bankruptcy filing. *Id.* Therefore, the court found that the debtor's expenses are one-half of the total family expense. *Id.* The proof adduced at the trial in this matter by the Trustee was to the contrary.

■ The Court declines to follow the rationale espoused in *Harmon*. Logically, if under *Harmon* all family expenses should be allocated 50/50 between the spouses, then many of the nonessential luxuries would likewise be half paid by the Debtor and this would clearly violate the intent and letter of § 1325(b)(2). Only those items needed for maintenance and support should be factored in, not the non-essential luxuries. The Court rejects, as inappropriate, the allocation of the expenses 50/50 between the Debtor and her spouse as a per se approach if their relative incomes are substantially disparate.

The Court opines that a more equitable and logical approach would be to have the Debtor and her spouse proportionally bear reasonable and necessary family expenses to maintain the family in the same relative ratio as their respective net incomes-in this case, 40% to the Debtor and 60% to her spouse. Further, the Court would disallow all unnecessary luxury items from the family budget in determining the Debtor's disposable income. It is simply inappropriate and unfair to the unsecured creditors to allow luxury items to be paid for through the expedient ploy of budgetary allocation to pay for same from the spouse's net income when, in fact, the Debtor directly or indirectly benefits therefrom such as the hairdresser, manicures and housekeeper expenses. Therefore, the Court denies confirmation of the Debtor's Plan because it fails to meet the spirit and letter of § 1325(b)(2) and § 1325(a)(3).

**2. *Paragraph 8 of the Plan does not modify the Trustee's rights under 11 U.S.C. § 1329***

■ Next, the Trustee argues that Paragraph 8 of the Plan[8] attempts to im-

permissibly modify the Trustee's rights under 11 U.S.C. § 1329.[9] The Trustee argues that with the proposals in the Plan of it being completed upon pre-payments, liquidation, gifts or loans without any payment to unsecured creditors, the Trustee is unable to determine when exactly the Plan would be complete. The Trustee asserts that this Plan provision is unnecessary because the current case law already provides this protection. The Debtor cites in opposition to the Trustee's argument two cases: *In re Casper*, 154 B.R. 243 (N.D.Ill.1993) and *In re Phelps*, 149 B.R. 534 (Bankr.N.D.Ill.1993).

In *Casper*, the debtors' Chapter 13 plan proposed to pay unsecured creditors over a sixty-month period at $550.00 per month with a pot of $33,000.00 for creditors. 154 B.R. at 245. The amount to be paid by the debtors under the confirmed plan that would provide for the payment of ten percent to the claims of the unsecured creditors totaled $18,956.13. *Id.* The court confirmed this plan. *Id.* Nearly two years after confirmation, the debtors made a $5,169.61 lump-sum payment to the trustee from funds they obtained from working overtime and from vacation pay. *Id.* Several months later, the debtors tendered to the trustee sufficient funds to cover ten percent of the claims of the unsecured creditors. *Id.* The trustee, subsequent to receiving the money, filed a motion to modify the plan. *Id.* The trustee maintained that, with the confirmed plan's monthly payment amount, the debtors could satisfy eighty percent of the allowed unsecured claims over the sixty-month period originally provided in the plan. *Id.* at 245–46. The court found that the debtors' plan required them to pay the unsecured creditors ten percent of their claims. *Id.* at 248. The court opined that all parties are bound by that plan until it was completed or modified before completion. *Id.* The court held that the debtors discharged their obligation under the plan by paying to the trustee sufficient funds to cover the ten percent owed to the unsecured creditors as provided in the plan. *Id.* Thus, the court found that the trustee's motion to modify the plan, which was filed subsequent to the completion of the payments, was untimely. *Id.*

*Casper* is distinguishable in that it involved a plan proposing to pay a set per-

8. Paragraph 8 of the Plan provides:
 8. Debtor shall have the option at any time after confirmation to prepay the monthly installments due under paragraph 1 using exempt assets or funds borrowed from friends or relatives. Upon receipt of such funds by the Office of the Chapter 13 Trustee and the making of any payment(s) required under paragraph 6, the "completion of payments" under this plan shall be deemed to have occurred for purposes of 11 U.S.C. § 1329 irrespective of whether such Trustee shall have completed the making of disbursements of available funds.

9. Section 1329 of the Bankruptcy Code provides that:
 (a) At any time after confirmation of the plan but before the completion of payments under such plan, the plan may be modified, upon request of the debtor, the trustee, or the holder on an allowed unsecured claim, to-
 (1) increase or reduce the amount of payments on claims of a particular class provided for by the plan;

 (2) extend or reduce the time for such payments; or
 (3) alter the amount of the distribution to a creditor whose claim is provided for by the plan, to the extent necessary to take account of any payment of such claim other than under the plan.
 (b)(1) Sections 1322(a), 1322(b) and 1323(c) of this title and the requirements of section 1325(a) of this title apply to any modifications under subsection (a) of this section.
 (2) The plan as modified becomes the plan unless, after notice and a hearing, such modification is disapproved.
 (c) A plan modified under this section may not provide for payments over a period that expires after three years after the time that the first payment under the original confirmed plan was due, unless the court, for cause, approves a longer period, but the court may not approve a period that expires after five years after such time.
 11 U.S.C. § 1329.

centage on allowed unsecured claims, unlike the Plan at bar which only proposes to pay, in Paragraph 2(c)(ii), a "pot" of $9,000.00 to general unsecured claimants, other than the Debtor's spouse, who is to be paid under Paragraph 2(c)(iii) of the Plan.

In *Phelps*, the trustee sought to modify the debtor's confirmed plan to increase the percentage that unsecured creditors would receive under the plan. 149 B.R. at 535. The confirmed plan provided that the unsecured creditors were to be paid ten percent of their claims. *Id.* The plan, like the percentage plan in *Casper*, further provided that the debtor would make monthly payments of $282.00 for forty-three months. *Id.* The total amount of unsecured claims timely filed by the unsecured creditors was well below the amount of unsecured debt in the debtor's schedules. *Id.* As a result, it took the debtor only thirty-seven months of payments, at $282.00 per month, to pay those unsecured creditors who timely filed proofs of claim their ten percent dividend. *Id.* Instead of completing the payments to unsecured creditors under the plan, the trustee filed a motion to amend the plan to require the debtor to continue making the $282.00 monthly payments to the trustee for six more months, thereby increasing the dividend to the unsecured creditors from ten percent to fifty-one percent. *Id.* at 535–36. The debtor objected to the trustee's motion. *Id.* at 536. The court denied the trustee's motion and found that the completion of payments occurs when the debtor has paid the percentage owed to each class of creditors as provided by the plan. *Id.* at 537. The court opined that "[t]he substance of a plan looks to the nature of the debtor's obligation to the debtor's

creditors, not the number of payments proposed." *Id.*

Next, the court addressed the question of whether "completion of payments" as used in § 1329(a) meant completion of payments by the debtor to the trustee, or completion of payments both by the debtor to the trustee and by the trustee to the creditors. *Id.* at 538. The court held that this phrase did not refer to the completion of payments by the trustee to the creditors, in addition to the completion of payments by the debtor to the trustee. *Id.* The court found that the phrase "completion of payments" as used in § 1329(a) means completion of payments by the debtor to the trustee. *Id.* at 539.

■ The Court overrules the Trustee's objection based on this ground under the rationale of *Casper* and *Phelps*. Section 1329(a) allows the Trustee to seek a modification of a Chapter 13 plan in order to increase or decrease the amount to be paid whether the plan is a "percentage" plan as in *Casper* and *Phelps*, or a "pot" plan as provided in the Plan at bar. The Seventh Circuit has opted for use of the plain meaning of § 1329 and has tacitly indicated a preference for "pot" plans over "percentage" plans. *See In re Witkowski*, 16 F.3d 739, 746–47 n. 11 (1994).

The Trustee can seek to modify the Plan only after confirmation, but before the completion of the Debtor's payments to the Trustee under the Plan. The Court does not read Paragraph 8 of the instant Plan as impermissibly restricting the Trustee's rights under § 1329.

### 3. *The Debtor will not likely complete all payments under the Plan pursuant to § 1325(a)(6)*

■ Further, the Trustee objects to confirmation of the Plan on the basis that Paragraph 6[10] of the Plan attempts to al-

---

10. Paragraph 6 of the Debtor's Plan provides: In the event that the aggregate amount of the 36 monthly payments required to be made by the Debtor under ¶ 1 is insufficient to permit payment in full of claims specified in ¶ 2(a) and ¶ 2(c)((i), (ii)(iii) and (iv)) of this plan, Debtor agrees, as permitted by 11

U.S.C. § 1322(b)(8), and shall be required as a condition of plan completion and discharge, to make lump sum payment(s) of the balance(s) remaining on such claims directly to their respective holders. Debtor agrees to use exempt employee benefit plan monies to accomplish such payments and

lows completion of amounts due under the Plan by gifts and loans from relatives, which demonstrates that the Debtor does not have the ability to complete all payments under the Plan as required by § 1325(a)(6). The Court finds that the Plan is not feasible as proposed, partially because of the vague and unenforceable references to gifts or loans. Although presently unanticipated, it may be possible for the Debtor to acquire sufficient funds to pre-pay the Plan if she falls heir to a decedent's estate over the thirty-six month Plan term, or if there are donors, presumably family or friends who may, for a variety of reasons, make inter vivos gifts to her to pay some or all of the remaining Plan payments. There is, however, no evidence in the record that this is likely to occur.

 The Plan proposes to pay to the Trustee $1,881.00 for thirty-six months. This amounts to a total sum over the life of the Plan of $67,716.00. The Trustee's statutory fees at the time of trial were set at 6.6% of this sum or $4,469.26 pursuant to 28 U.S.C. § 586(e)(1) and (2). Pursuant to the filed claims, there are secured claims of Aetna which total $22,769.06 and Equity in the sum of $44,500.00. These two claims alone total $67,269.06. The Debtor retorts that the judgment un-

derlying Equity's claim is being appealed. However, Equity has a presumptively valid and enforceable judgment against the Debtor with a recorded judgment lien against her real property. *See* 735 ILCS 5/12–101; *Casey Nat. Bank v. Roan,* 282 Ill.App.3d 55, 218 Ill.Dec. 124, 668 N.E.2d 608 (4th Dist.1996); *In re Harrison,* 164 B.R. 611, 614 (Bankr.N.D.Ill.1994). A judgment is conclusive on the parties to that judgment until altered or set aside by a court of competent jurisdiction. *See Dillman v. Nadelhoffer,* 23 Ill.App. 168 (2d Dist.1886).

Thus, the Plan must give Equity's secured claim proper consideration and priority in time over First Union's junior mortgage claim. Equity's claim is bifurcated under 11 U.S.C. § 506(a) and is deemed allowed as a secured claim in the amount of $44,500.00 and as an unsecured claim in the amount of $47,486.66. That the Debtor seeks to partially fund the Plan based on unspecified gifts or loans from unidentified sources is speculative and uncertain. Certainly no evidence of imminent or expected gifts or loans was adduced at trial. Thus, the Court will not confirm the Plan as proposed on that basis.

**4.** *Unfair classification under the Plan*

 Next, the Trustee contends that Paragraph 2(c)(ii) and (iii)[11] of the

hereby waives her state law exemption for such monies to the extent necessary to make such payments, unless she is able and does make such lump sum payment(s) from other funds available to her at the end of the term of this plan from other sources including but not necessarily limited to monies hereafter gifted or loaned to her by relatives.

11. Paragraph 2(c)(ii) and (iii) provides:
2. From the payments so received, and except as provided in paragraph 4 below, the Trustee shall make disbursements as follows:
(c) Subsequent to completion of dividends disbursed under subparagraph 2(a) above but contemporaneous with the making of the disbursements under subparagraph 2(b) above, dividends to creditors whose timely filed claims are duly allowed shall be paid as follows:
ii. The next $9,000 in disbursements on claims shall be made prorata on allowed,

timely filed general unsecured claims including such claims for which there is a co-debtor.
iii. Thereafter and as permitted by 11 U.S.C. § 1322(b)(1), remaining monies available for disbursement to creditors shall be disbursed prorata on the balance remaining to be paid on those allowed, timely filed general unsecured claims for a consumer debt of the debtor where and only if any other individual is liable on such consumer debt with the debtor, until the earlier to occur of (A) the exhaustion of paragraph 1 funds available to make disbursements to creditors; and (B) the payment in full of such claims including post-petition interest at the contract rate and any fees and charges permitted to be imposed both by the contract and enforceable under applicable non-bankruptcy law.

Plan unfairly classifies unsecured debts with a cosigner to be more favorably treated because amended Schedule J shows that the Debtor's spouse has the ability to fund any amount that would not be paid in the Plan. The Trustee cites *In re McKown*, 227 B.R. 487 (Bankr.N.D.Ohio 1998); *In re Martin*, 189 B.R. 619 (Bankr.E.D.Va.1995); *In re Cheak*, 171 B.R. 55 (Bankr.S.D.Ill. 1994); and *In re Battista*, 180 B.R. 355 (Bankr.D.N.H.1995) in support of his position.

Section 1322(a)(3) allows classification of claims but mandates the same treatment for each claim within a particular class. The Plan classifies claims among the various priority, secured and unsecured claimants with different treatment among the classes. Pursuant to § 1322(b)(1), a plan may "designate a class or classes of unsecured claims, . . . but may not discriminate unfairly against any class so designated; however, such plan may treat claims for a consumer debt of the debtor if an individual is liable on such consumer debt with the debtor differently than other unsecured claims." 11 U.S.C. § 1322(b)(1).

▆▆▆ The statute does not provide standards for determining when a plan discriminates "unfairly." Courts have developed a four-part test to determine if the discrimination is unfair: (1) whether the discrimination has a reasonable basis; (2) whether the debtor can carry out a plan without the discrimination; (3) whether the plan is proposed in good faith; and (4) whether the degree of discrimination is directly related to the basis or rationale for the discrimination. *In re Christophe*, 151 B.R. 475, 478 (Bankr.N.D.Ill.1993). Not all elements are met by the Plan at bar. As the Court later discusses and concludes, the Plan's discrimination against Equity, and its treatment of Equity's allowed secured claim, is unreasonable in light of the Debtor's proposal to pay First Union's junior mortgage claim prior to Equity's claim.

▆▆▆ The Court agrees with the Trustee's position that a debtor's ability to classify cosigned debts under § 1322(b)(1) is not absolute. In the *McKown* case, the debtor was proposing to pay a cosigned unsecured creditor in full while only proposing to pay ten percent to the other unsecured creditors. 227 B.R. at 489. The court held that the option of providing different treatment to a cosigned, unsecured consumer obligation does not mean that the debtor has been "dealt a wild card that automatically permits the debtor to discriminate unfairly against his or her general unsecured creditors when doing so." *Id.* at 492 (citations omitted). Rather, the court employed a balancing test to determine the impact upon the nonfiling cosigner and whether the cosigner could afford to pay his share of the debt. *Id.* at 492–94. The court held that the cosigner would not be unduly harmed if he had to pay the remainder of the debt. *Id.* at 494. The court denied confirmation of the debtor's plan. *Id.*

In addition, the Fifth Circuit Court of Appeals has held that where a debtor proposed to pay a cosigned debt in full, with twelve percent interest, prior to any distributions to the general unsecured class, such plan could not be confirmed. *See In re Chacon*, 202 F.3d 725, 726 (5th Cir. 1999). The *Chacon* court noted that "[d]ifferences in treatment are not discriminatory if they rationally further a legitimate interest of the debtor and do not disproportionately benefit the cosigner . . . ." *Id.*

The Court finds the situation in *McKown* analogous to the matter at bar. Pursuant to the amended Schedule J, the cosigner spouse clearly has the ability to pay his share of any joint unsecured debt. That the Plan proposes to pay the co-debtor claim of the spouse in full, yet will produce a dividend of approximately 10% to the other general unsecured creditors, produces a widely disparate result. Moreover, as discussed infra, Equity's secured claim is receiving unfair discriminatory treatment because Equity receives nothing

until the last month of the Plan's term. Thus, the Court must deny confirmation on this basis.

### 5. *The language in Paragraphs 2(c)(iv) and 4(b) of the Plan is unclear and cryptic*

Next, the Trustee argues that the language utilized in Paragraphs 2(c)(iv) and 4(b) of the Plan is unclear.[12] The Debtor retorts that the lack of clarity is the result of the Trustee's inability to comprehend the paragraphs.

 The Court sustains the Trustee's objection regarding these paragraphs of the Debtor's Plan. The Court still has trouble understanding the intended meaning of these paragraphs, which are convoluted, somewhat prolix and confusing to apply. For example, it is not clear or certain which allowed secured claimants are to be paid directly by either the Debtor or her spouse under Paragraphs 2(c)(iv) or 4(b) of the Plan. One alternative for the Debtor when drafting a coherent and easily understandable plan is to utilize the clear and concise Model Form Chapter 13 Plan. It is now available from the Court's Web Site located on the Internet at www.ilnb.uscourts.gov. The Model Form Plan is also available in hard copy in Chambers and the Clerk's Office.

### D. *Equity's Objection to Confirmation of the Debtor's Plan*

Equity argues that the Debtor's Plan cannot be confirmed for two reasons: (1) the Plan violates § 1322(b)(1) in that it unfairly discriminates against Equity and the general unsecured creditors; and (2) the Plan violates § 1325(a)(6) because the Debtor's ability to make the payments proposed by the Plan is uncertain and speculative.

Section 1322(b)(1) of the Bankruptcy Code allows a Chapter 13 debtor to designate classes of unsecured claims so long as no creditors are discriminated against unfairly. 11 U.S.C. § 1322(b)(1). As one court has noted:

> In addition, Paragraph 4(b) of the Plan provides:
>
>> Any Holder of an allowed secured claim, the last scheduled payment of which is not due per the terms of the agreement until after the 36 month term of this Plan, shall not receive payments under this Plan from the Chapter 13 Trustee, but Debtor shall instead maintain and continue to make payments specified by the agreement directly on such claims as authorized by 11 U.S.C. § 1322(b)(5). The holder shall retain both the lien securing such claim and all rights under the terms of the agreement except that any provision which permits the holder to declare a default or to accelerate payments solely on account of the commencement of this bankruptcy case shall be of no force and effect. For the purpose of identifying those claims governed by this ¶ 4(b), claims falling within this category shall expressly exclude the claims of Equity Insurance Managers listed on Debtor's bankruptcy Schedule D and of Aetna Life Insurance Company, Trustee of the Irland and Rogers 401(k) Plan, and shall expressly include all other claims listed on Debtor's bankruptcy Schedule D.

---

**12.** Paragraph 2(c)(iv) of the Plan provides:
2. From the payments so received, and except as provided in paragraph 4 below, the Trustee shall make disbursements as follows:
(c) Subsequent to completion of dividends disbursed under subparagraph 2(a) above but contemporaneous with the making of the disbursements under subparagraph 2(b) above, dividends to creditors whose timely filed claims are duly allowed shall be paid as follows:
iv. Next, disbursements shall be made on allowed secured claims (except for the secured claim of Aetna Life Insurance Company, Trustee of the Irland and Rogers 401(k) Plan and except for such claims being paid directly by Debtor or her spouse pursuant to paragraph 4(b) below) whose holders shall retain the lien securing such claims so long as the claim remains an allowed secured claim and which such claims shall be paid in full with post-petition interest at the statutory interest rate from time to time prevailing. To the extent the funds available for disbursement from the Office of the Chapter 13 Trustee are insufficient to complete payment of this provision, the insufficiency shall be paid in accordance with paragraph 6 below.

[N]o taint automatically attaches to a Chapter 13 plan merely because it creates a differentiation in treatment among classes of unsecured claims-just because it "discriminate[s] against" one or more classes in the nonpejorative sense of the word "discriminate." Instead the statutory prohibition is limited to plans that "discriminate unfairly"-and of course Congress has chosen to leave the critical word "unfairly" wholly undefined.... If a plan affording such preferential treatment is to survive scrutiny under the statutory "discriminate unfairly" test, the debtor must place something material onto the scales to show a correlative benefit to the other unsecured creditors....

*McCullough v. Brown,* 162 B.R. 506, 508–09 and 517–18 (N.D.Ill.1993).

Equity argues that the Debtor's Plan unfairly discriminates against it because the Plan makes an unenforceable promise to pay Equity's secured claim out of exempt assets in the thirty-sixth month of the Plan with no provision to adequately protect Equity's secured judgment lien against the family residence. Further, Equity contends that such discrimination is proposed with no correlative benefit to the other creditors in the case.

The Debtor's Plan proposes to pay all other claims, secured, unsecured and priority, before paying anything on the secured claim of Equity. This includes paying First Union's junior mortgage claim ahead of Equity's secured claim as a result of its judgment lien, a memorandum which was apparently recorded prior to the junior mortgage. The Debtor proposes to pay Equity's claim from her exempt 401(k) plan in month thirty-six of the Plan. The Court finds that this proposed treatment of Equity's claim constitutes unfair discrimination for purposes of § 1322. The Debtor argues that her proposal to pay Equity's secured claim in full with interest renders the discriminatory treatment of Equity's claim fair. The Court disagrees and notes that it also ignores the disparate

treatment afforded Equity's unsecured claim along with the other general unsecured claimants vis a' vis the separate treatment of the Debtor's spouse's claim to be paid under Paragraph 2(c)(iii) of the Plan. If the Debtor's Plan were to fail, or if the Debtor decided not to proceed with her bankruptcy case by dismissing it at any time, as is her right under 11 U.S.C. § 1307(b), then Equity would have received no payments from the Debtor and would be left with no recourse against the Debtor's exempt asset, the 401(k) plan, for payment of its under secured claim.

In response to this argument, the Debtor has proposed to amend the Plan to provide that if the case is dismissed on account of nonpayment of her Plan obligations, any order of dismissal would mandate the payment of post-confirmation interest on Equity's allowed secured claim from such assets pursuant to the waiver. No rate of interest is specified and the Court is not inclined to prescribe one by judicial fiat. The Court notes that the Illinois post-judgment interest rate is 9% per annum. *See* 735 ILCS 5/2–1303. Only the Debtor can draft and propose a plan at this stage, and this Court will not engage in the art of plan draftsmanship. In addition, the Debtor proposes to shorten the time frame of payment to Equity in the event that the litigation concerning Equity's claim is completed sooner than the three-year term of the Plan. This is insufficient to meet the requirements of § 1322.

The Court disagrees with Equity's argument that the proposal to utilize exempt assets to pay Equity's secured claim without providing Equity any adequate protection payments to preserve its secured position constitutes unfair discrimination against Equity. Pursuant to § 1325, a debtor is not required to provide adequate protection to creditors, as adequate protection issues, pursuant to 11 U.S.C. § 361, most commonly arise in the context of stay relief motions based on 11 U.S.C. § 362(d)(1). Rather, § 1322(b)(1) merely requires that a plan not "unfairly" discrim-

inate against creditors. There really is no satisfactory rationale to explain what is fair as distinguished from unfair discrimination either in the statutory text or the case law attempting to construe it. The unfair discrimination here in this Plan is to place payment of Equity's secured claim at the end of the Plan after payments to the administrative and unsecured creditors and a junior secured creditor. Section 1322(b)(4) only allows payments on unsecured claims to be made concurrently with payments on secured and other unsecured claims, not prior to payments on allowed secured claims. *See* 11 U.S.C. § 1322(b)(4).

The Debtor further argues that to force her to immediately pay any part of Equity's secured claim using otherwise exempt retirement monies before the outcome of the appeal is known results in her incurring potentially unnecessary early withdrawal penalties under the Internal Revenue Code. The Debtor maintains that she is willing to incur those penalties only after the exercise of her appeal rights and claim objection proceeding prove unsuccessful. Finally, the Debtor states that this treatment of Equity's claim is permitted under 11 U.S.C. § 1322(b)(10).[13] No case law or other supporting authority has been cited in support of this point. Consequently, this results in the forfeiture of the point. *See LINC Finance Corp. v. Onwuteaka*, 129 F.3d 917, 921 (7th Cir.1997); *Pelfresne v. Village of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir.1990). The Court does not have a duty to research and construct legal arguments available to a party. *Head Start Family Educ. Program, Inc. v. Cooperative Educ. Service Agency 11*, 46 F.3d 629, 635 (7th Cir.1995).

The Court disagrees with the Debtor's contention that § 1322(b)(10) allows for this type of treatment of Equity's claim. Section 1322(b)(10) must be read in conjunction with § 1325(a)(1) which provides that a Chapter 13 plan is not entitled to confirmation unless it complies with the provisions of Chapter 13 and with all other applicable title 11 provisions. The Court finds that this treatment of Equity's secured claim in the last month of the Plan, while the Debtor pays First Union's junior secured claim throughout the term of the Plan, unfairly discriminates against Equity, and thus such treatment is not sanctioned by § 1322(b)(10). It also violates § 1322(b)(4). Further, the Court finds that this Plan provision has no correlative benefit to the other unsecured creditors. The other creditors would not be affected if the Debtor were to draw on her 401(k) plan now instead of in three years. Consequently, the discriminatory treatment of Equity's claim is unfair and confirmation of the Debtor's Plan must be denied for this reason.

Next, Equity argues that the Debtor's Plan is unfair when it proposes to pay one general unsecured creditor in full while paying less to her other general unsecured creditors who do not have a co-debtor. The claim of Aetna is listed on the Debtor's Schedule D as a claim secured by the Debtor's assets in her 401(k) account. Equity argues that a claim is only considered to be a secured claim to the extent of the "creditor's interest in the estate's interest" in the property that secures the debt. *See* 11 U.S.C. § 506(a). Equity cites *In re Kerr*, 199 B.R. 370 (Bankr.N.D.Ill.1996) for the proposition that once property of the debtor is claimed exempt, it is no longer property of the estate. Equity contends that because the Debtor has claimed the assets in her 401(K) account exempt, those assets are no longer property of the estate, and thus, Aetna's claim is not secured under § 506. Hence, according to Equity, Aetna has a general unsecured claim that does not have a co-debtor.

---

**13.** Section 1322(b)(10) provides in relevant part:

> (b) Subject to subsections (a) and (c) of this section, the plan may-

> (10) include any other appropriate provision not inconsistent with this title.

11 U.S.C. § 1322(b)(10).

 The Court overrules Equity's objection to the Debtor's Plan on this ground. Section 541(a) defines property of the estate. It does not contain an exclusion for exempt property. Equity misstates *Kerr*. Specifically, *Kerr* stated:

A general principle of bankruptcy law is that upon the filing of a case in bankruptcy all of the debtor's property becomes property of the estate. See 11 U.S.C. § 541(a)(1), (a)(2). This includes property that a debtor intends to claim as exempt. *Taylor v. Freeland & Kronz*, 503 U.S. 638, 641, 112 S.Ct. 1644, 1647, 118 L.Ed.2d 280 (1992). Thereafter, if the debtor properly claims property as exempt and no objections to the exemption are sustained, the property is deemed exempt and is no longer part of the estate. . . .

199 B.R. at 373–74 (citation and footnote omitted). As of the petition date, the 401(k) monies were property of the Debtor's estate and though claimed exempt under 735 ILCS 5/12–1006, does not mean that Aetna lacks secured claimant status vis à vis the corpus of the 401(k) account maintained for the Debtor's benefit. Aetna's secured claim has not been objected to by any party. Thus, its claim is deemed allowed under 11 U.S.C. § 502(a).

 Lastly, Equity maintains that the Debtor's ability to make the required payments under the Plan is uncertain and speculative in violation of § 1325(a)(6). Pursuant to § 1325(a)(6), the debtor must "be able to make all payments under the plan and to comply with the plan." 11 U.S.C. § 1325(a)(6). Section 1325(a)(6) requires the Court to determine that the Debtor's Plan has a reasonable likelihood of success. *See In re Craig*, 112 B.R. 224, 225 (Bankr.N.D.Ohio 1990) (citation omitted).

 The Debtor's Plan requires her to withdraw from her exempt 401(k) account in the thirty-sixth month of the Plan. Equity contends that such withdrawal is governed by the terms of the trust in which the funds are held as well as the provisions of the Internal Revenue Code and ERISA. Equity argues that the Debtor will not be able to withdraw the funds from her 401(k) plan unless the trust instrument has a hardship clause allowing such early withdrawal.

The Court finds that the Debtor has not provided sufficient evidence to demonstrate that the trust instrument of her 401(k) plan allows for early withdrawal, and if it does, whether a withdrawal would be allowed under her circumstances. Further, she has not demonstrated with any certainty that those funds will be there and available at that point in time. The Debtor testified at trial that the assets are invested in blue chip and technology stocks subject to market vagaries and fluctuations (which in recent months have been wide and various depending of the stock issue). At this point, it is wholly speculative as to how much or whether these assets will exist in the Plan's thirty-sixth month. The Debtor is unwilling to make an early withdrawal until she has exhausted her appeal rights.

In her first modification to the Plan, filed after the trial, the Debtor agreed to show after confirmation that at least $57,-000.00 of her exempt retirement funds are invested in federally insured investments which shall be so maintained until receipt of her discharge or dismissal of her case. No such proffer was made at the time of trial and there is no evidence before the Court at this stage to substantiate this belated attempted safeguard for Equity's secured claim. This is not an acceptable functional equivalent of posting a supersedeas bond to secure Equity's presumptively valid judgment lien.

The Court finds Equity's treatment under the Plan unfair and unacceptable. The Plan proposes to pay First Union before paying Equity anything, which is in contravention of § 1322(b)(4). Such treatment unfairly discriminates against Equity's partially secured claim. Hence, con-

firmation of the Plan must be denied on this ground.

### E. *The Motions of Equity and the Trustee to Dismiss*

■ Both the Trustee and Equity argue that the case should be dismissed under 11 U.S.C. § 1307(c). Pursuant to § 1307(c), the Court has the power to dismiss a bankruptcy case for cause. Section 1307(c) provides in relevant part:

> (c) Except as provided in subsection (e) of this section, *on request of a party in interest* or the United States trustee and *after notice and a hearing, the court may* convert a case under this chapter to a case under chapter 7 of this title, or may *dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause, including—*
>
> > (5) *denial of confirmation of a plan under section 1325 of this title....*

11 U.S.C. § 1307(c)(5) (emphasis supplied). These listed "causes" are not exhaustive, nor is the Court limited to this list. *See Ekeke v. United States*, 133 B.R. 450, 452 (S.D.Ill.1991). .

■ Lack of good faith in filing a bankruptcy case constitutes "cause" under § 1307(c) to dismiss the case. *See In re Love*, 957 F.2d 1350, 1354 (7th Cir.1992); *Eisen v. Curry (In re Eisen)*, 14 F.3d 469, 470 (9th Cir.1994); *Gier v. Farmers State Bank of Lucas, Kansas (In re Gier)*, 986 F.2d 1326, 1329 (10th Cir.1993); *In re Klevorn*, 181 B.R. 8, 10 (Bankr.N.D.N.Y. 1995). The Trustee and Equity have the burden of proof on a challenge to the Debtor's good faith in filing this case. *See* 11 U.S.C. § 1307(c); *Love*, 957 F.2d at 1355. In contrast, the Debtor has the burden of proof to meet the plan good faith requirements of 11 U.S.C. § 1325(a)(3). *Id.* In the Seventh Circuit, bankruptcy courts must look at the totality of the circumstances, including several factors when determining if a Chapter 13 petition and/or plan was filed in good faith: (1) the nature of the proceedings; (2) the timing of the petition; (3) how the debt arose; (4) the debtor's motive in filing the petition; (5) how the debtor's actions affected creditors; (6) the debtor's treatment of creditors both before and after the petition was filed; and (7) whether the debtor was forthcoming with the bankruptcy court and the creditors. *Id. Love* stated that the focus of the good faith inquiry is often whether the filing is fundamentally fair to the creditors, and whether it complies with the spirit of the Bankruptcy Code's provisions. 957 F.2d at 1357. All of these factors have been considered in light of the evidence adduced at trial.

■ The Court declines to dismiss the Debtor's case at this stage. This is a first filing for the Debtor. It is not at all uncommon for a Chapter 13 petition to be filed on the heels of adverse litigation. Rather than post a supersedeas bond with the state court while the Debtor appeals Equity's judgment, she chose to file in this Court and seeks to reorganize her debts to all her creditors, rather than deal just with Equity alone-a much more complex and difficult process under the Bankruptcy Code. The Plan at bar is a flawed attempt to deal with all of her creditors. The Court concludes, however, that the Debtor has been forthcoming and is not attempting to abuse the system or her creditors. She should be afforded the opportunity to propose a facially confirmable plan. While this Plan does not meet the good faith requirements of § 1325(a)(3), this is not a one creditor, one debtor fight where there is no real intent to reorganize, but merely to continue long standing litigation. Here, the Debtor has many other creditors whose claims must be appropriately treated and considered. Thus, the Court reserves ruling on the motions to dismiss at this time and gives the Debtor leave to file another amended plan.

### IV. *CONCLUSION*

For the foregoing reasons, the Court sustains, in part, the objections of the

Trustee and Equity to the Debtor's Plan and denies confirmation of the Plan. The Court reserves ruling on the motions of Equity and the Trustee to dismiss. The Debtor is given fourteen days to file a third amended plan. If a plan is not filed, the case shall be dismissed. If a plan is filed, the continued confirmation hearing will be held on July 14, 2000 at 11:00 a.m. in Courtroom 2000, 505 North County Farm Road, Wheaton, Illinois.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.