**In re Mary Kay McNICHOLS, Debtor.**

**No. 99 B 18053.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Dec. 14, 2000.

Arthur G. Jaros, Jr., Richter & Jaros, Oak Brook, IL, for Debtor.

Barry A. Chatz, Steven J. Christenholz, Mariam R Stein, Kamensky & Rubinstein, Lincolnwood, IL, Francis X. Buckley, Jr., Thompson Coburn, LLP, St. Louis, MO, for Respondent.

## MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on the motion of Mary Kay McNichols (the "Debtor") pursuant to Federal Rule of Civil Procedure 59(e) to alter or amend the Court's Memorandum Opinion and Order dated October 26, 2000, which denied confirmation of the Debtor's third amended plan of reorganization, dismissed the Chapter 13 case with prejudice and barred the Debtor from filing another bankruptcy case for one year. For the reasons set forth herein, the Court denies the motion.

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (L) and (O).

## II. FACTS AND BACKGROUND

The Court entered a Memorandum Opinion and Order on October 26, 2000, which denied confirmation of the Debtor's third amended plan of reorganization, dismissed the Chapter 13 case with prejudice, and barred the Debtor from filing another bankruptcy case for one year. *See In re McNichols,* 254 B.R. 422 (Bankr.N.D.Ill. 2000) (the *"McNichols II Opinion"*). Prior to that, the Court issued a decision wherein it denied confirmation of the Debtor's second amended plan of reorganization. *See In re McNichols,* 249 B.R. 160 (Bankr.N.D.Ill.2000) (the *"McNichols I Opinion"*). Both of those Opinions contain the facts and background of this case and need not be repeated here.

After the Court denied confirmation of the Debtor's third amended plan and dismissed the case, the Debtor filed the instant motion to alter or amend. The Debtor argues that the Court committed errors of law and made findings of fact against the manifest weight of the evidence. Specifically, the Debtor maintains that the Court made the following errors of fact: (1) the Court's statement about the Debtor having four attempts to obtain a facially confirmable plan erroneously overstated the opportunity the Court afforded the Debtor; (2) the Court's statement that the original plan provided for no payments to Equity was a patent error induced by Equity's closing argument; (3) the Court's statement that the original plan proposed monthly payments to the Trustee of only $18.45 for thirty-six months misstated the fairness of the original plan by understating the magnitude of the payments there-

under; (4) the Debtor did not make any argument with respect to segregated income and expenses; and (5) the Court's statement that the Debtor's plan provided for payment of Equity's secured claim only after all of the state court litigation is complete, rather than at the end of the plan, constitutes a misreading of the plan.

In addition, the Debtor contends that the Court made the following errors of law: (1) the unfair discrimination standard should not have been applied to the co-debtor consumer claims; (2) the unfair discrimination standard should not have been applied to Equity's secured claim; (3) the Court had no basis for ruling that Equity's secured claim must be paid first; (4) the ruling that Equity would have no recourse against exempt assets is devoid of legal basis; (5) the Court failed to address the Debtor's tax saving motive; (6) the determination that the Debtor is not committing all of her disposable income to fund the plan is based upon multiple errors of law, contradicts the *McNichols I Opinion*, and is against all of the evidence; (7) the omission in the Debtor's Schedules I and J of unnecessary items was mandated by the Code and the Schedules; and (8) the dismissal of the case under 11 U.S.C. § 1307(c)(5) violates that section as a matter of law.

Further, the Debtor contends that the Court's ruling denied her due process by (1) failing to consider the final reply memorandum of the Debtor, despite assuring her that such brief would be afforded final consideration; and (2) contradicting and not providing clear guidance in the *McNichols I Opinion* on the issue of separate classification and treatment of co-debtor consumer debts. The Court will address each point raised by the Debtor.

## III. *APPLICABLE STANDARDS*

The Seventh Circuit Court of Appeals has instructed courts to treat all substantive post-judgment motions filed within ten days of judgment under Federal Rule of Civil Procedure 59. *Charles v. Daley,* 799 F.2d 343 (7th Cir.1986). Because the Debtor's motion was filed on November 1, 2000, within ten days from the entry of the judgment, the procedural standards and authorities construing Rule 59 control.

Rule 59(e) motions serve a narrow purpose and must clearly establish either a manifest error of law or fact or must present newly discovered evidence. *Moro v. Shell Oil Co.,* 91 F.3d 872, 876 (7th Cir.1996); *Federal Deposit Ins. Corp. v. Meyer,* 781 F.2d 1260, 1268 (7th Cir.1986); *Publishers Resource, Inc. v. Walker–Davis Publications, Inc.,* 762 F.2d 557, 561 (7th Cir.1985). "The rule essentially enables a district court to correct its own errors, sparing the parties and the appellate courts the burden of unnecessary appellate proceedings." *Russell v. Delco Remy Div. of General Motors Corp.,* 51 F.3d 746, 749 (7th Cir.1995) (citation omitted). The function of a motion to alter or amend a judgment is not to serve as a vehicle to relitigate old matters or present the case under a new legal theory. *Moro,* 91 F.3d at 876 (citation omitted); *King v. Cooke,* 26 F.3d 720, 726 (7th Cir.1994), *cert. denied,* 514 U.S. 1023, 115 S.Ct. 1373, 131 L.Ed.2d 228 (1995). Moreover, the purpose of such a motion "is not to give the moving party another 'bite of the apple' by permitting the arguing of issues and procedures that could and should have been raised prior to judgment." *Yorke v. Citibank, N.A. (In re BNT Terminals, Inc.),* 125 B.R. 963, 977 (Bankr.N.D.Ill.1990) (citations omitted). The rulings of a bankruptcy court "are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure." *See Quaker Alloy Casting Co. v. Gulfco Indus., Inc.,* 123 F.R.D. 282, 288 (N.D.Ill.1988). "A motion brought under Rule 59(e) is not a procedural folly to be filed by a losing party who simply disagrees with the decision; otherwise, the Court would be inundated with motions from dissatisfied litigants." *BNT Terminals,* 125 B.R. at 977. The decision to grant or deny a Rule 59(e) motion is within the Court's discretion. *See LB Credit Corp. v. Resolution Trust Corp.,* 49 F.3d 1263, 1267 (7th Cir.1995).

## IV. DISCUSSION

### A. Errors of Fact

 First, the Court will address the Debtor's argument that the Court's statement in the *McNichols II Opinion* about the Debtor having four attempts to obtain a facially confirmable plan erroneously overstated the opportunity the Court afforded the Debtor. Specifically, the Debtor points to the statement that "[e]nough is enough. Four attempts to obtain a facially confirmable plan in over one year in a single case is ample opportunity." 254 B.R. at 432. The Debtor, however, did not cite the sentence preceding that statement which noted that "the Court declines the Debtor's request to allow yet a further opportunity to propose, file and serve any further iteration of a plan predicated on the Debtor's claimed disposable income, which she has misstated and distorted in this substantial and material way." *Id.*

Those sentences followed the Court's discussion of the Debtor's failure to disclose an $850.00 aggregate monthly 401(k) plan contribution, via a payroll deduction, in her Schedules. The Court ultimately held that the Debtor's failure to disclose this ongoing and substantial payroll deduction constituted grounds for denial of confirmation of the third amended plan as well as dismissal of the bankruptcy case. *Id.* at 436. While the Court agrees with the Debtor's statement that only two confirmation hearings were conducted, the Debtor did in fact propose at least four versions of a Chapter 13 plan and two modifications thereof. The Debtor filed a "First Modification to Second Amended Plan" and a "Second Modification to Second Amended Plan" on April 11, 2000. Hence, the Court's statement did not erroneously misstate the Debtor's opportunities to propose a facially confirmable Chapter 13 plan. Based on the Debtor's failure to disclose the 401(k) plan contribution by payroll deduction anywhere in her Schedules or at the first confirmation hearing on the second amended plan, the Court determined that the Debtor had sufficient opportunity to both disclose her true financial situation and propose multiple plans. Thus, the Court did not thwart the Debtor's opportunity to propose a facially confirmable plan.

Next, the Debtor takes exception with the Court's statement in the *McNichols II Opinion* that the original plan provided "no payments to Equity." 254 B.R. at 434. The Debtor argues that this is a patent error induced by Equity's closing argument. The Debtor contends that paragraphs 2(b) and 6 of the original plan filed in June 1999, provided for full payment of Equity's allowed secured claim with statutory interest. Further, the Debtor states that each version of the Debtor's plan has provided for full payment of Equity's allowed secured claim with interest at the statutory rate. Moreover, the Debtor contends that the Court overlooked that it was the Debtor who filed a proof of claim on behalf of Equity to assure that such payments would be made under the plan. Finally, the Debtor argues that the Court's finding that "the Debtor has gone to great lengths to avoid paying Equity's judgment and partially secured claim" is contrary to the record and against all of the evidence. *Id.*

First, the Court notes that it did not state, find or conclude in the *McNichols II Opinion* that the Debtor's filing of an objection to Equity's proof of claim, or that the Debtor's prosecution of an appeal of the judgment Equity obtained against the Debtor to the Illinois Appellate Court constituted bad faith on the part of the Debtor or grounds for dismissal of the case or denial of confirmation of the plan. The Court is quite perplexed by the Debtor's statement in footnote number one of the instant motion which suggests that the Court stated that such actions on the part of the Debtor demonstrated bad faith or grounds for dismissal or denial of confirmation. The Debtor's suggestion that the Court made any such statement, finding or conclusion wholly lacks merit.

Evidently, the Debtor needs her memory refreshed regarding Equity's claim.

Pursuant to Federal Rule of Bankruptcy Procedure 3002, Equity, as a secured creditor, was not obligated to file a proof of claim. Rather, the Debtor filed a proof of claim on Equity's behalf indicated that Equity was entitled to a secured claim in the amount of $44,500.00. The Debtor then objected to the claim on the basis that it was not valid because the Debtor had filed an appeal of the judgment underlying Equity's claim. The Debtor subsequently withdrew her objection to Equity's claim. The Court did not overlook the fact that the Debtor filed a proof of claim on behalf of Equity. The Court recognized such fact in the *McNichols I Opinion. See* 249 B.R. at 164.

That act on the part of the Debtor, however, does not necessarily demonstrate that the Court's finding that the Debtor has gone to great lengths to avoid paying Equity's judgment and partially secured claim is contrary to the record and against all of the evidence. The Debtor's original plan did not provide for any payments to Equity during the course of the plan. The Debtor points to paragraphs 2(b) and 6 of the original plan to support her argument that this version of her plan did provide for payment to Equity. After close review of those paragraphs, however, the Court finds that those provisions do not make any mention whatsoever of Equity or any payment of its claim. The Debtor's argument that these provisions in fact provide for payment to Equity does not necessarily make it so. Those paragraphs are devoid of any reference to or mention of Equity or the payment of its claim. Those paragraphs only make reference to the holders of allowed secured claims. The original plan only mentioned Equity in paragraph seven. That paragraph stated in relevant part:

> Debtor is aware that her former employer Equity Insurance Managers LLC holds a money judgment ... entered against her on April 22, 1999, in the amount of $91,000. Debtor understands that if such claim were allowed as a secured claim, the special provision of ¶ 6 above would necessarily operate.

However, Debtor has contested the correctness of the judgment through a post-judgment motion to reconsider which was denied ... on May 18, 1999.... Debtor intends to commence an appeal to the Illinois Appellate Court in a timely manner, seeking to set aside such judgment and Debtor further intends to object to the allowance of any claim of Equity Insurance Managers LLC.

*See* Debtor's Chapter 13 Plan filed on June 22, 1999 at p. 2, ¶ 7. This plan speaks for itself. The language in paragraph seven makes it patently clear that the Debtor would be appealing the judgment underlying the claim and also objecting to the allowance of Equity's claim. Thus, the Debtor's statement that each of her plans has provided for full payment of Equity's allowed secured claim with interest is not entirely accurate.

Next, the Debtor argues that the Court's finding that "the Debtor has gone to great lengths to avoid paying Equity's judgment and partially secured claim" is contrary to the record and against the manifest weight of the evidence. *See* 254 B.R. at 434. The Court disagrees with the Debtor's argument. The Court found in the *McNichols II Opinion* that the Debtor's plans demonstrated a "lack of fairness in dealing with some of her creditors, particularly Equity." *Id.* Specifically, the Court made the following findings: (1) the original plan did not provide for payments to Equity; (2) the second amended plan provided for no payments to Equity until the final month of the plan; and (3) the third amended plan provided for a 9% interest only payment to Equity over the term of the plan, with the balance to be paid at the conclusion of all appeals, which could easily occur after the term of the plan. *Id.* Thus, the record and the evidence fully support the Court's finding that the Debtor has gone to great lengths to avoid paying Equity's claim.

Further, the Debtor takes issue with the Court's statement that "[t]he original plan

proposed a monthly payment to the Trustee of only $18.45 for thirty-six months." *Id.* The Debtor argues that the Court used this statement as evidence of the Debtor's "lack of fairness in dealing with some of her creditors, particularly, Equity." *Id.* The Debtor maintains that this finding misstates the fairness of the original plan by understating the magnitude of payments thereunder. Specifically, the Debtor argues that the Court ignored the Debtor's proposed use of assets under 11 U.S.C. § 1322(b)(8) to pay Equity's allowed secured claim in full, and ignored the fact that the original plan was proposing monthly payments from the Debtor's disposable income of $2,676.95–$2,658.50 was in direct payments by the Debtor and $18.45 in payments through the Trustee's office. The Debtor alleges that the *McNichols II Opinion* gave no indication that these points were considered. The Debtor argues that these points were discussed in her closing reply, which was filed on October 13, 2000. According to the Debtor, instead of addressing her arguments, the Court adopted Equity's misleading discussion.

First and foremost, the Court gives full consideration to all arguments raised by all parties in any papers that are filed before the Court. Merely because the Court did not accept the Debtor's arguments and did not refer to all of them in its decision does not, ipso facto, mean that those points were discarded without full and fair consideration, despite the Debtor's suggestion to the contrary. Moreover, the Court notes that while the Debtor claims that she proposed to make monthly payments of $2,658.50 "outside" of the original plan, that plan did not make reference to that payment. Even so, none of that money was allocated for Equity's claim. Further, none of the $18.45 monthly payment made to the Trustee was specified to be in payment of Equity's claim. The fact remains that the Debtor's original plan only proposed a monthly payment to the Trustee of $18.45 for thirty-six months. It is fruitless at this point for the Debtor to argue otherwise. Hence, the Court did

not understate the magnitude of the payments made "under" or "inside" that plan.

Additionally, the Debtor contends that the Court made reference in the *McNichols II Opinion* to the Debtor's "argument of segregated income and expenses" and "claim of segregated expenses" and that no such argument or claim was made by the Debtor at trial or in any of her papers filed before the Court. 254 B.R. at 431. Therefore, according to the Debtor, this finding is against all of the evidence. The Debtor further argues that at the January confirmation hearing on the second amended plan, she testified that after Equity obtained its $91,000.00 judgment, she and her husband began maintaining separate accounts and from that separate account she was paying 50% of the mortgage debt and real estate taxes. The Debtor argued that this segregation of income and expenses brought her within the 50/50 expense allocation under the case of *In re Harmon*, 118 B.R. 68 (Bankr. E.D.Mich.1990), which the Court rejected in the *McNichols I Opinion*, and instead adopted the 40/60 apportionment of expenses based on the net incomes of the Debtor and her spouse. *See* 249 B.R. at 172–73. The Debtor claims that the failure to segregate may bar the use of the 50/50 expense split principle articulated in *Harmon*, but that has no bearing or impact on expense apportionment based on the spouse's income used in computing the Debtor's share of disposable income. The Debtor argues that the expense apportionment based on the relative incomes of the spouses is applicable whether the Debtor and her spouse maintain separate accounts or continue to pool their earnings in a common household account. Thus, according to the Debtor, when she filed her third amended plan and second amended Schedule J, which apportioned household expenses at 40/60 between her and her spouse, she made no representation that she was segregating expenses.

The Court rejects the Debtor's argument that it made an error of fact. In the *McNichols II Opinion*, the Court noted:

Moreover, the Debtor's testimony does not support her argument of segregated income and expenses between her and her spouse or that the budgeted monthly expenses are reasonably accurate. The Court previously rejected the Debtor's argument that she is a separate operating economic unit. *McNichols*, 249 B.R. at 170. At the confirmation hearing, the Debtor testified that an $80.00 charge for her daughter's manicures and expenses from camp, for approximately $137.00, were paid from her checking account when she allowed her daughter to use her debit card. *See* Trustee's Exhibit Nos. 1 and 2. The Court finds this testimony inconsistent with her claim of segregated expenses allegedly paid by her spouse.

*See* 254 B.R. at 431. The Debtor misinterprets the language in this paragraph. The Court never found that the Debtor was arguing, as part of confirmation of her third amended plan, that the plan was based on a physical segregation of monies. Rather, the Court found that the Debtor's testimony, as outlined above, did not comport with her argument or claim that she and her spouse had apportioned the expenses 40/60 and that the budgeted expenses were reasonably accurate. The Debtor's statement that the third amended plan "apportioned" the household expenses instead of "segregated" them constitutes semantic haggling.

The Debtor conveniently failed to cite the portion of the *McNichols II Opinion* which further explained why the Debtor had not proposed the plan in good faith:

the Debtor's testimony from both confirmation hearings does not support the proposed segregation of expenses between her and her spouse. Moreover, the Debtor's testimony does not support the accuracy of all of the amounts of those expenses listed on the Schedules.... Further, the Debtor testified that she has made payments for luxury items for camp expenses and manicures

for her daughter in direct contravention of her Schedules. The deleted luxury expenses from the Debtor's second amended Schedules I and J are still being enjoyed by the Debtor and her family to some extent, and the allocation of expenses between the spouses varies from the filed budget. The variances between the filed budgetary line items and who is paying what items to maintain the Debtor's lifestyle, as evidenced by her testimony and her bank statements, further demonstrates that the Debtor has actually misled this Court.

254 B.R. at 434.

Moreover, the Court disagrees with the Debtor's argument that it is legally irrelevant under the Bankruptcy Code which spouse is paying what bills as long as the computation of the Debtor's disposable income is properly made and she is making the plan payments. If the Debtor has excess income to pay for luxury items such as manicures and camp expenses for her daughter, that certainly factors into the Court's determination of whether the Debtor is committing all of her disposable income to fund the plan. This is especially true in light of the fact that the Court held that manicures constituted luxury items and were not necessary for the maintenance and support of the Debtor or her dependents. Furthermore, the Debtor's amended Schedules I and J deleted any reference to such luxury expenses. *See* 254 B.R. at 431. The Debtor's testimony at the confirmation hearing that she was in fact paying for some of these luxury expenses had substantial bearing on the Court's decision not to confirm any of her Chapter 13 plans. Thus, the Debtor's argument that the Court made any findings that the Debtor was claiming or arguing that the plan was based on physical segregation of monies between the Debtor and her spouse misconstrues the findings and conclusions made by the Court.

Next, the Debtor argues that the Court made an erroneous finding of fact and misread the plan when it stated that the

Debtor's plan provided for payment of "Equity's secured claim after all of the state court litigation is complete, rather than at the end of the plan." *See* 254 B.R. at 428–29. Again, the Debtor has failed to cite explanatory language which followed that sentence:

> The Court noted that "the Debtor proposes to shorten the time frame of payment to Equity in the event that the litigation concerning Equity's claim is completed sooner than the three-year term of the Plan. This is insufficient to meet the requirements of § 1322." [*McNichols I Opinion*, 249 B.R. at 178]. The Court held that the Debtor's plan "must give Equity's secured claim proper consideration and priority in time over First Union's junior mortgage claim." *Id.* at 175. *That the Debtor has proposed yet another plan that seeks to pay Equity interest only, while paying principal on the claims of all other claimants, both secured and unsecured, violates both this Court's Opinion and § 1322(b)(10) and (b)(4).*

254 B.R. at 429 (emphasis supplied).

The Debtor argues that the point of every plan version has been to assure full payment with interest of Equity's allowed secured claim by the end of the plan term and sooner if the litigation completes prior to that time. The Debtor cites the first subparagraph of paragraph six of the plan which requires the Debtor, as a condition of plan completion and discharge, to make the lump sum payment to Equity. The Debtor then cites paragraph eight of the plan which permits the Debtor to prepay the plan. Finally, the Debtor cites the third subparagraph of paragraph six as an "override provision" which requires the Debtor to make the lump sum payment sooner than the completion of the plan term if the litigation with Equity completes during the plan term. The Debtor further contends that the payment of Equity's claim has an outer limit of the three-year plan term and the daily interest thereon compensates Equity for its wait pursuant to 11 U.S.C. § 1325(a)(5)(B).

The Court disagrees with the Debtor's statement that the point of every plan has been to assure full payment of Equity's allowed secured claim. The Court finds that the true motivation behind every plan has been to stall and delay the payment of Equity's claim in the hopes that the Debtor would prevail in the state court appellate litigation. The plans have unreasonably discriminated against Equity's allowed secured claim in light of the Debtor's proposal in the second amended plan to pay First Union's junior mortgage claim prior to Equity's secured judgment lien claim. Unfortunately for the Debtor, this type of treatment of Equity's secured claim is not sanctioned by the Bankruptcy Code.

Furthermore, the above recitation of the Debtor's argument validates the Court's finding that the third amended plan was "similarly confusing" to that of the second amended plan. *See* 254 B.R. at 435. The Debtor's argument on this point illustrates this finding. The Debtor's third amended plan has two provisions that purportedly override one another and make for a confusing, unclear plan. If, in fact, this Court did misinterpret the Debtor's intention behind her plans, it was simply due to the confusing and prolix language contained therein, rather than the suggested Model Form Chapter 13 Plan format referenced in the *McNichols I Opinion*. *See* 249 B.R. at 177.

## B. *Errors of Law*

The Debtor argues that the Court made several errors of law. The Debtor contends that the Court violated 11 U.S.C. § 1322(b)(10), burdened the Debtor's plan with requirements for confirmation not contained in Title 11, and made conclusions contrary to this statute and the case law decided thereunder. First, the Debtor argues that the Court erred in holding that 11 U.S.C. § 1322(b)(1), which provides that a plan may not discriminate unfairly against a class of unsecured claims, bars any special treatment of co-debtor consumer claims under the last portion of

§ 1322(b)(1).[1] The Debtor contends that the effect of the Court's decision is to read the "however" clause of § 1322(b)(1) out of the Bankruptcy Code. The Debtor maintains that the text of § 1322(b)(1) and the legislative history shows that the unfair discrimination test is inapplicable to classifications falling with the "however" clause.

In the *McNichols I Opinion*, the Court addressed the Trustee's argument that the Debtor's second amended plan unfairly classified unsecured debts with a cosigner to be more favorably treated. *See* 249 B.R. at 175–76. The Trustee argued that the Debtor's amended Schedule J showed that the Debtor's spouse had the ability to fund any amount that would not be paid in the plan. *Id.* at 176. The Court found that because the Debtor's spouse could afford to pay any remaining amount of the joint unsecured debt, no disparate treatment was appropriate. The Court followed the logic and reasoning of *In re McKown*, 227 B.R. 487 (Bankr.N.D.Ohio 1998). Specifically, the Court stated:

> The Court finds the situation in *McKown* analogous to the matter at bar. Pursuant to the amended Schedule J, the cosigner spouse clearly has the ability to pay his share of any joint unsecured debt. That the Plan proposes to pay the co-debtor claim of the spouse in full, yet will produce a dividend of ap-

proximately 10% to the other general unsecured creditors, produces a widely disparate result.

249 B.R. at 176.

The Debtor further argues that the court misread and misapplied the decision in *In re Chacon*, 202 F.3d 725 (5th Cir. 1999). According to the Debtor, the Court's consideration of *In re Christophe*, 151 B.R. 475 (Bankr.N.D.Ill.1993) was incorrect because that case classified a student loan, not a co-debtor consumer debt, and that court did not consider the exception to the unfair discrimination requirement made by the "however" clause. The Debtor charges that the Court committed clear and reversible error by confusing what constitutes unfair discrimination with whether the unfair discrimination test even applies to separate classification of co-debtor consumer debts. Further, the Debtor contends that she was denied her due process of law because the Court announced a decision—that the co-debtor must be required to pay "his share"—and then later redefined the meaning of that phrase without affording the Debtor an opportunity to respond.[2] Additionally, the Debtor argues that the Court failed to respond to her argument set forth on page three of her response to the Trustee's objection to confirmation of the second amended plan.[3]

---

1. Section 1322(b)(1) provides in relevant part:

 (b) Subject to subsections (a) and (c) of this section, the plan may—
 (1) designate a class or classes of unsecured claims, ... but may not discriminate unfairly against any class so designated; *however, such plan may treat claims for a consumer debt of the debtor if an individual is liable on such consumer debt with the debtor differently than other unsecured claims.*

 11 U.S.C. § 1322(b)(1) (emphasis supplied).

2. The Court will address this portion of the Debtor's argument later in the Opinion when it discusses the alleged due process violations.

3. The Debtor's argument specifically stated:

 The Trustee's objection of unfair discrimination is contrary to law in the Northern District of Illinois. § 1322(b)(1) of the Code was amended in 1984 to expressly permit separate classification of co-debtor claims for consumer debt, which could otherwise constitute impermissible unfair discrimination. Judge Ginsberg's opinion in *Chapman*, 146 B.R. 411 at 416 (1992) states:

 > Section 1322 was amended in 1984 to allow for separate classification and disparate treatment of consumer debts of the debtor where another individual acted as a cosigner on the debt. In other words, a debtor can pay more in a Chapter 13 plan to a consumer creditor who could look to any individual codebtor for payment, and may even unfairly discriminate in favor of such a creditor in order to protect the codebtor from being pressured by the creditor to pay the portion of the cosigned debt the Chapter 13 plan does not propose to pay.

 Judge Wedoff is of the same view (footnote 7 to opinion in *Brown*, 152 B.R. 232 at 238, 239 (1993) reversed on other grounds by 162 B.R. 506 (N.D.Ill.1993)).

Section 1322(b)(1) permits a debtor to separately classify and treat differently a consumer debt, if an individual is liable on such debt with the debtor. The legislative history to this section notes that "[a]lthough there may be no theoretical differences between codebtor claims and others, there are important practical differences" that should be recognized. *See* S.Rep. No. 65, 98th Cong., 1st Sess. 17 (1983). "If, as a practical matter, the debtor is going to pay the codebtor claim, he should be permitted to separately classify it in chapter 13." *Id.* at 18. In 1984, Congress amended § 1322(b)(1) to add this authorization for the separate classification of co-signed debts.

■ The Debtor argues that the unfair discrimination test in the first portion of § 1322(b)(1) is inapplicable to the treatment of co-debtor consumer claims because of the word "however." The legislative history to § 1322(b)(1), however, does not expressly except co-debtor consumer claims from the unfair discrimination test. Moreover, it is unclear from the language of the statute what exception the word "however" is intended to express. One leading treatise has noted the problems attendant to this language:

> Use of the introductory word "however" suggests that Congress intended the power to separately classify co-signed consumer debts to be an exception to the classification power with limitations immediately preceding it in § 1322(b)(1). Because the preceding grant of authority is broad, subject only to the statutory proscription against unfair discrimination, it is not clear as a matter of sentence construction what the word "however" is intended to convey. Is "however" intended to except separate classification of co-signed debts from the "unfair discrimination" limitation on classification? Does the "however" validate all separate classifications of co-signed debts without regard to the effects on other creditors? Several courts have gone almost that far by holding that the 1984 amendment "automatically sanctions different and favored treatment for a debtor's consumer debts which are cosigned by another individual and constitutes a 'carve out' to the 'unfair discrimination' standard." Other courts continue to apply the "unfair discrimination" standard to plans that separately classify co-signed consumer debts.
>
> It is not obvious why Congress used the word "differently" to describe the permitted treatment of a separately classified co-signed claim. "Differently" seems to have content separate from the unfair discrimination standard of the clause that immediately precedes it. If "differently," coupled with the introductory "however," was intended to validate *all* separate classifications of co-signed debts, then a multitude of clearer ways to say so were available to Congress. Arguably, the grant of power to treat co-signed consumer debts "differently" does not automatically authorize all discriminations in favor of co-signed claims. But the meaning of "differently" is obscure if it was intended to permit some separate classifications of co-signed debts but not others.

1 K. Lundin, *Chapter 13 Bankruptcy* § 4.62 at p. 4–134–136 (2d ed.1994) (emphasis in original and footnotes omitted). Courts are split regarding whether the unfair discrimination standard applies to classification of co-signed debts. *Compare In re Easley,* 72 B.R. 948, 956 (Bankr. M.D.Tenn.1987) (Debtor's power to treat co-signed debts "differently" does not automatically authorize all discrimination in favor of co-signed claims. "Differently" has context separate from the proscription against unfair discrimination.); *In re Lewman,* 157 B.R. 134, 136–37 (Bankr.S.D.Ind. 1992) ("While the Codebtor Classification allows separate classification of consumer debts on which codebtors are liable, it does not dictate that all such classifications pass muster.... The Codebtor Classification simply means that separate classification and treatment on the sole basis of codebtor liability is not *per se* unfair discrimination. Debtors still bear the bur-

den of showing that separate classification and treatment of unsecured claims does not unfairly discriminate. . . ."); *In re Cheak,* 171 B.R. 55, 58 (Bankr.S.D.Ill.1994) (Separate classification of co-signed claim is subject to the unfair discrimination test, notwithstanding § 1322(b)(1). Separate classification for 100% payment of a credit card debt co-signed by a nonfiling spouse is unfair discrimination.); *In re Battista,* 180 B.R. 355, 357 (Bankr.D.N.H.1995) (Unfair discrimination test applies to separate classification of co-signed claims. "[A]uthority is split on whether the 'however' clause is a carve-out from the unfair discrimination test. . . . [T]he better view is that the unfair discrimination standard applies to plans that separately classify co-signed consumer debts.") *with In re Dornon,* 103 B.R. 61, 64 (Bankr.N.D.N.Y.1989) (The 1984 amendment "automatically sanctions different and favored treatment for a debtor's consumer debts which are co-signed by another individual and constitute a 'carveout' to the 'unfair discrimination' standard. . . ."); *In re Chapman,* 146 B.R. 411, 416 (Bankr.N.D.Ill.1992) (Section 1322 was amended in 1984 to allow for separate classification and disparate treatment of co-signed consumer debts without regard to unfair discrimination. Any other separate classification is permissible, by implication, only if the discrimination is fair.); *In re Riggel,* 142 B.R. 199, 204 (Bankr.S.D.Ohio 1992) (Section 1322(b)(1) excepts co-signed claims from the unfair discrimination test.).

The Court rejects the Debtor's argument that the clear language of § 1322(b)(1) and its legislative history demonstrate that the unfair discrimination standard is inapplicable to the treatment of co-debtor consumer claims. The Court, in the *McNichols I Opinion,* agreed with the approach taken by the line of cases that requires courts to apply the unfair discrimination standard to separate classification of co-signed consumer debts. The Court cited *McKown* and *Chacon* in support of its position. The Court disagrees with the Debtor's assertion that it misread and misapplied *Chacon.* The court in *Chacon* noted:

the "however" clause can be read without creating any unnecessary use of synonyms simply by interpreting it to clarify that such treatment of cosigned consumer debt is usually not unfairly discriminatory. Differences in treatment are not discriminatory if they rationally further a legitimate interest of the debtor and do not disproportionately benefit the cosigner. . . .

202 F.3d at 726.

Implicit in the Court's *McNichols I* and *II* Opinions was the premise that the unfair discrimination standard applies to separate classification of co-debtor consumer debts. The Court followed that line of case authority by citing to *McKown* and *Chacon.* As a consequence, the Court respectfully disagreed with the other line of case authority, which included *Chapman* and *Brown.* Accordingly, the Court did respond to the Debtor's argument set forth on page three of her response to the Trustee's objection to confirmation of the second amended plan. That the Court did not adopt the approach taken by the line of cases cited by the Debtor does not mean that the Court did not consider same.

Moreover, the Court disagrees with the Debtor's contention that the Trustee's objection of unfair discrimination was "contrary to the law in the Northern District of Illinois." The fact that two other bankruptcy judges in the Northern District of Illinois adopted the approach that the unfair discrimination standard does not apply to co-signed consumer debts of debtors because of the "however" clause in the latter portion of § 1322(b)(1), does not constitute the "law in the Northern District of Illinois." This Court is not bound by the decisions of other bankruptcy judges in the same district. Rather, under the principle of stare decisis, inferior or lower courts are bound to follow the decisions of superior courts. *In re Shattuc Cable Corp.,* 138 B.R. 557, 565 (Bankr. N.D.Ill.1992). Under this hierarchy, it is

clear that this Court is bound by the decisions of the United States Supreme Court and the Seventh Circuit Court of Appeals. *Id.* As the Seventh Circuit has aptly noted:

> [D]istrict judges in this circuit must not treat decisions *by other district judges*, in this and a fortiori in other circuits, as controlling, unless of course the doctrine of res judicata or of collateral estoppel applies. Such decisions will normally be entitled to no more weight than their intrinsic persuasiveness merits. The reasons we gave for giving some though not controlling weight to decisions of other federal courts of appeals do not apply to decisions of other district courts, because the responsibility for maintaining the law's uniformity is a responsibility of appellate rather than trial judges and because the Supreme Court does not assume the burden of resolving conflicts between district judges whether in the same or different circuits.

*Colby v. J.C. Penney Co., Inc.*, 811 F.2d 1119, 1124 (7th Cir.1987) (emphasis in original). *See also United States v. Articles of Drug Consisting of 203 Paper Bags,* 818 F.2d 569, 572 (7th Cir.1987) ("[A single district court decision] is not binding on the circuit, or even on other district judges in the same district."). This language equally and logically applies to decisions of bankruptcy judges.

Judges of this bankruptcy court frequently follow law pronounced by other judges of this court, unless there are substantive reasons not to do so. Here, the Court respectfully disagreed with the approach taken by two other judges of this court for the reasons articulated. This difference of opinion, however, does not equal a failure to follow the binding law pronounced in this district, absent a definitive decision from the Seventh Circuit or the United States Supreme Court. Consequently, the Debtor's argument on this point fails.

The Court rejects the Debtor's argument that it committed clear and reversible error regarding the application of the unfair discrimination standard to the separate classification of the co-signed consumer debt of the Debtor. The Court did not confuse what constitutes unfair discrimination when it held that the Debtor's classification of the unsecured debts with her co-signer nonfiling spouse constituted unfair discrimination proscribed by § 1322(b)(1). Hence, the application of the *Christophe* factors was not in error.

In addition, the Court rejects the Debtor's argument that it committed error when it held that the nonfiling spouse could afford to pay "his share" of remaining amounts of the joint unsecured debts. The Court is not charged with the task of proposing payment of certain sums under appropriate terms to a debtor's creditors sufficient in amount to meet the Bankruptcy Code's confirmation requirements. That task belong to debtors and their attorneys, not the courts.

Next, the Debtor argues that the Court erred in holding that the unfair discrimination standard applies to Equity's secured claim. Again, the Debtor contends that the Court failed to address arguments she made in post-trial briefs filed regarding confirmation of the plan. The Court rejects the Debtor's contention that it applied the unfair discrimination standard to Equity's secured claim. The language in the *McNichols II Opinion* demonstrates that the Court held that the Debtor's third amended plan unfairly discriminated against the general unsecured creditors in contravention of § 1322(b)(1). Specifically, the Court noted:

> In addition, the Court finds that the Debtor's third amended plan unfairly discriminates against the general unsecured creditors and thus fails to meet the requirements of § 1322(b)(1). The current version of the Debtor's plan provides that the debts for which the Debtor's spouse is also liable are to be paid at 40% of the total amount due, while the remaining unsecured creditors are to be paid approximately 10% of the total amount due. The Court held that while

the Bankruptcy Code allows the Debtor to treat these types of claims differently than other unsecured claims, such treatment must not discriminate unfairly against the other unsecured creditors. [*McNichols I Opinion*, 249 B.R. at 176–77]. In measuring the disparate treatment of these types of claims, the Court employed a "balancing test" to determine the impact of the bankruptcy filing on the nonfiling co-debtor and whether the nonfiling co-debtor has the ability to pay his share of the debt. *Id.* at 176. After analyzing the potential impact on the finances of the co-debtor spouse, the Court found that the Debtor's spouse "clearly has the ability to pay his share of any joint unsecured debt." *Id.* As a result, the Court held that the treatment of co-debtor debts was improper. *Id.* at 176–77.

254 B.R. at 430. Based on this language, the Court holds that the Debtor's argument lacks merit.

Further, the Debtor argues that the Court adopted the novel position, without any statutory or case support, that in order for the Debtor's Chapter 13 plan to meet with favor, it must pay the principal on Equity's secured claim before or concurrent with paying principal on other secured claims. The Debtor maintains that the Court violated § 1322(b)(10) because the Court created an additional confirmation requirement for secured claims without a lawful basis. The Debtor argues that her plan complied with § 1325(a)(5)(B). In addition, the Debtor states that Equity's proof of unsecured claim, which was filed late, is deemed disallowed. Hence, the Debtor argues that the Court erred in deeming the unsecured claim allowed. Also, the Debtor contends that the Court did not explain what it meant by priority "in time."

Once again, the Debtor fails to cite the language preceding the sentence that the Debtor takes issue with. In the *McNichols I Opinion*, the Court held that the Debtor's plan could not be confirmed on the basis that the Debtor would not likely complete all payments under the plan pursuant to § 1325(a)(6).[4] In particular, the Court found that paragraph 6 of the second amended plan attempted to allow for completion of amounts due under the plan by gifts and loans from relatives. *See* 249 B.R. at 174–75. The Court held that this demonstrated that the Debtor did not have the ability to complete all payments under the plan as required by § 1325(a)(6). *Id.* The Court held that the plan was not feasible partially because of the vague references to gifts and loans. *Id.* at 175. The Court found that there was no evidence in the record to demonstrate that the Debtor would in fact receive any gifts or loans from relatives. *Id.* Next, the Court set forth the total sum to be paid to the Trustee over the life of the plan and how that amount did not equal the two secured claims of Equity and Aetna. In relevant part the Court stated:

> The Plan proposes to pay to the Trustee $1,881.00 for thirty-six months. This amounts to a total sum over the life of the Plan of $67,716.00. The Trustee's statutory fees at the time of trial were set at 6.6% of this sum or $4,469.26 pursuant to 28 U.S.C. § 586(e)(1) and (2). Pursuant to the filed claims, there are secured claims of Aetna which total $22,769.06 and Equity in the sum of $44,500.00. These two claims alone total $67,269.06. The Debtor retorts that the judgment underlying Equity's claim is being appealed. However, Equity has a presumptively valid and enforceable judgment against the Debtor with a recorded judgment lien against her real property. *See* 735 ILCS 5/12–101; *Casey Nat. Bank v. Roan*, 282 Ill.App.3d 55, 218 Ill.Dec. 124, 668 N.E.2d 608 (4th Dist.1996); *In re Harrison*, 164 B.R.

---

4. Section 1325(a)(6) provides:

 (a) Except as provided in subsection (b), the court shall confirm a plan if—

 (6) the debtor will be able to make all payments under the plan and to comply with the plan.

11 U.S.C. § 1325(a)(6).

611, 614 (Bankr.N.D.Ill.1994). A judgment is conclusive on the parties to that judgment until altered or set aside by a court of competent jurisdiction. *See Dillman v. Nadelhoffer*, 23 Ill.App. 168 (2d Dist.1886).

Thus, the Plan must give Equity's secured claim proper consideration and priority in time over First Union's junior mortgage claim. Equity's claim is bifurcated under 11 U.S.C. § 506(a) and is deemed allowed as a secured claim in the amount of $44,500.00 and as an unsecured claim in the amount of $47,486.66. That the Debtor seeks to partially fund the Plan based on unspecified gifts or loans from unidentified sources is speculative and uncertain. Certainly no evidence of imminent or expected gifts or loans was adduced at trial. Thus, the Court will not confirm the Plan as proposed on that basis.

249 B.R. at 175.

■ The Court was making the point that the amount that the Debtor proposed to pay to the Trustee over the life of the plan was insufficient to pay the two allowed secured claims, especially Equity's claim. The Debtor fails to grasp the principle that a Chapter 13 plan which provides for the payment in full of a junior secured claim prior to payment of a senior secured claim is contrary to applicable Illinois law on the priority of payments made by debtors to secured creditors with mortgage and/or judgment liens. It is undisputed that Equity has a judgment lien which was recorded against the Debtor's residence prior in time to the junior mortgage lien of First Union. As a consequence, Equity's lien has priority over First Union's lien and must be paid before First Union. Under Illinois law, it is axiomatic that the first mortgage recorded has priority. *See, e.g., Firstmark Standard Life Ins. Co. v. Superior Bank FSB*, 271 Ill.App.3d 435, 439, 208 Ill.Dec. 409, 649 N.E.2d 465, 468 (1st Dist.1995). In other words, first in time is the first in right. That is what the Court meant by the statement that the Debtor's plan must give Equity's secured claim proper consider-

ation based on its recorded memorandum of judgment because it was prior in time of recording to the junior mortgage claim of First Union.

■ Moreover, the Court takes issue with the Debtor's contention that Equity's proof of unsecured claim was filed late and thus is deemed disallowed. It was the Debtor who filed a secured proof of claim on Equity's behalf on January 7, 2000, indicating that Equity was entitled to a secured claim in the amount of $44,500.00. *See* 249 B.R. at 164. The Debtor then objected to the claim on the basis that it was not valid because the Debtor filed an appeal of the judgment underlying the claim. *Id.* The Debtor subsequently withdrew her objection to Equity's claim. *Id.* Equity then filed an amended proof of claim asserting a secured component totaling $44,500.00 and an unsecured component of $47,486.66. *Id.* at 164–65. The Debtor argues that pursuant to 11 U.S.C. § 502(b)(9) and Federal Rule of Bankruptcy Procedure 3002(c) the unsecured portion of Equity's claim is deemed disallowed because it was filed late.

Section 502(a) of the Bankruptcy Code reads "[a] claim ... proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest ... objects." 11 U.S.C. § 502(a). Federal Rule of Bankruptcy Procedure 3002, which was intended to implement 11 U.S.C. § 501 and § 502 provides that "[a]n unsecured creditor ... must file a proof of claim to be allowed...." Fed.R.Bankr.P. 3002(a). Bankruptcy Rule 3002(a) contains exceptions, only one being applicable here, to the mandate that unsecured creditors "must file a proof of claim" pertinent in Chapter 13 cases. Bankruptcy Rule 3004 permits the filing of a proof of claim by the debtor or the Chapter 13 trustee if the claim holder fails to timely file its own proof of claim, which is not subject to the same time limits imposed on claimants who file their own claims under Bankruptcy Rules 3002(c) and 9006(b)(3). That is precisely what the Debtor did here for Equi-

ty. The majority of courts, as well as this Court, have concluded that Bankruptcy Rule 3002 does not require a secured claim holder to file a proof of claim within ninety days of the first date set for the meeting of creditors. *See, e.g., In re Burrell,* 85 B.R. 799, 800 (Bankr.N.D.Ill.1988). Equity subsequently filed an amendment to the proof of claim on March 1, 2000, asserting an unsecured component. The Seventh Circuit has allowed a creditor to amend its proof of claim if it meets the relation back test of Federal Rule of Civil Procedure 15(c). *See In re Unroe,* 937 F.2d 346 (7th Cir.1991). That is precisely what happened in this matter.

The Debtor cites to § 502(b)(9) in support of her proposition.[5] Section 502(a) provides that a claim filed under § 501 is deemed allowed unless a party objects. Section 502(b)(9) provides that if such objection to a claim is made, the court shall determine the amount of such claim and shall allow such claim except to the extent that the claim was not timely filed. On March 8, 2000, the Debtor filed an objection to the unsecured portion of Equity's claim on the basis that it was untimely. Equity filed its amended proof of claim on March 1, 2000, after the claims bar date. However, Equity as a secured creditor, was not required under the Bankruptcy Code and Rules to file a proof of claim, as to the secured component of its claim. Equity has one claim arising out of its state court judgment which has been effectively bifurcated under § 506(a) into secured and unsecured components as noted in the *McNichols I Opinion. See* 249 B.R. at 175.

■ The Court finds that Equity's amended proof of claim, which asserted an unsecured component totaling $47,486.66,

relates back to the proof of claim, as to the secured component of its judgment, filed on its behalf by the Debtor on January 7, 2000. The entire amount of the claim, both secured and unsecured, relates to the judgment obtained by Equity against the Debtor in the sum of $91,000.00. Pursuant to § 506(a), that claim was bifurcated. *Id.* Equity's secured component of its claim, $44,500.00, is secured by a junior judgment lien on the Debtor's marital home which was filed subsequent to the first mortgage recorded against that property. Even if the Court were to find that Equity's amended proof of claim was filed late, under *Unroe,* the Court has broad equitable powers to permit a late-filed claim as an amendment to a timely filed proof of claim. That is what the Court has done here. Thus, the Court did not err when it deemed Equity's unsecured component of its claim allowed, notwithstanding the Debtor's objection thereto. Unless and until the state court reverses the judgment Equity holds against the Debtor, Equity's claim should be deemed allowed.

Further, the Debtor argues that the Court's determination that Equity would have no recourse against the Debtor's exempt assets is devoid of any legal basis. In the *McNichols II Opinion,* the Court held:

Moreover, the plan proposes to utilize exempt assets to make the payment to Equity. As the Court has already stated, if the plan were to fail or if the Debtor decided not to proceed with the case in the thirty-fifth month of the plan, Equity would have received no principal payments from the Debtor and would be left with no recourse against the Debtor's exempt assets for payment of its claim. [*McNichols I Opinion,* 249 B.R.

---

5. Section 502(b)(9) provides in pertinent part:

(b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such

claim in such amount, except to the extent that—
(9) proof of such claim is not timely filed, except to the extent tardily filed as permitted under paragraph (1), (2), or (3) of section 726(a) of this title or under the Federal Rules of Bankruptcy Procedure....

11 U.S.C. § 502(b)(9).

at 178]. *The plan purports to waive the Debtor's exemption in her 401(k) assets to the extent of Equity's secured claim. The Court finds this insufficient to cure the manifest discrimination against Equity in favor of the junior secured claim of First Union.*

254 B.R. at 428 (emphasis supplied). The Debtor argues that her waiver of exemption in her 401(k) assets, to the extent of Equity's secured claim, is enforceable and cites 11 U.S.C. § 1327(a), *In re Schnabel,* 153 B.R. 809 (Bankr.N.D.Ill.1993) and *In re Kerr,* 199 B.R. 370 (Bankr.N.D.Ill.1996) in support of her position. Furthermore, the Debtor states that her plan provides for retention by Equity of its lien as required by the plan and, if the plan were to fail, Equity would have its entire $91,000.00 claim unbifurcated and would be entitled to enforce it against the Debtor's interest in the residence and other non-exempt assets. The Debtor maintains that the Bankruptcy Code only requires her to show that she had the ability to make the payments under § 1325(a)(6) and to afford Equity's secured claim the treatment under § 1325(a)(5). The Debtor maintains that the Court failed to cite any statutory or case authority for the proposition that the Debtor's waiver is ineffective or for the proposition that "Equity must be given recourse against assets on which it had no lien as of the petition date." The Debtor concludes that the Court's ruling is unsupported by law and contradicted by § 1325(a)(5) and (6) and § 1322(b)(10).

The Debtor's plan purported to waive her exemption in her 401(k) assets to the extent of Equity's secured claim. In the above-quoted language of the *McNichols II Opinion,* the Court did not find the Debtor's waiver ineffective. Rather, once again, the Debtor has failed to quote, in it entirety, the Court's ruling and has taken the language out of context. The Court clearly noted that such waiver of her exemption in the 401(k) assets was "insuffi-

cient to cure the manifest discrimination against Equity in favor of the junior secured claim of First Union." 254 B.R. at 428. The Court did not hold that such a waiver was unenforceable or ineffective. Instead, this language addressed Equity's objection that the payment of the principal of Equity's secured claim after payment to other junior secured and unsecured creditors violated the Code. The Court still believes that if the Debtor were to voluntarily dismiss the case, as would be her right under 11 U.S.C. § 1307(b), then Equity would have received no payments from the Debtor and would be left without any recourse against the exempt 401(k) assets outside of the bankruptcy case. Further, the Court never stated that Equity must be given recourse against assets on which it had no lien as of the petition date. This argument by the Debtor completely misapprehends and mischaracterizes the Court's ruling.

Finally on this point, § 1327(a) and the *Schnabel* and *Kerr* cases do not support the Debtor's position. Section 1327(a)[6] does not apply here because the Court has not confirmed the Debtor's plan. The *Kerr* case dealt with the issue of whether the proceeds from the debtor's sale of exempt real estate should be included in the disposable income calculation under § 1325(b)(2). *Kerr* cited to *Schnabel* for the proposition that the voluntary contribution of exempt income in effect removes its exempt status and therefore that income becomes property of the estate. *See* 199 B.R. at 374 n. 11. Those cases and that issue are inapposite to the matter at hand.

Moreover, the Debtor further argues that the Court did not address and, therefore, apparently overlooked the Debtor's discussion of the point regarding her tax saving motive. The Debtor argues that the tax saving motive coupled with the pending state court appeal is a reason for

---

**6.** Section 1327(a) provides:
(a) The provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided

for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan.
11 U.S.C. § 1327(a).

the plan provision deferring payment of the principal of Equity's secured claim. The Debtor argues that this deferral is expressly authorized by § 1325(a)(5)(B), § 1322(b)(8), § 1322(b)(10) and *In re St. Cloud,* 209 B.R. 801 (Bankr.D.Mass.1997).

While the Debtor's motive in deferring payment of the principal of Equity's secured claim may be fueled by her desire for tax saving, such tax benefits to the Debtor are not relevant for purposes of whether the Debtor has complied with the requirements of confirmation under § 1325(a). The Court did not overlook the Debtor's discussion of this point. *See* Debtor's Closing Argument in Reply to Argument of Equity at p. 8. In that brief, the Debtor failed to cite any case or statutory authority that expressly authorizes her to defer payment of the principal of Equity's secured claim so that she may enjoy tax saving benefits. Her argument that this deferral of payment to Equity for her beneficial tax purposes is sanctioned by § 1325(a)(5)(B), § 1322(b)(8), § 1322(b)(10) and *St. Cloud* lacks merit. These Code provisions and this citation do not "expressly authorize," as she contends, this type of treatment of Equity's secured claim.

Further, the Debtor argues that the Court adopted Equity's argument, without citation to any authority, that the Debtor must guarantee that she will not voluntarily dismiss the case prior to the plan completion. The Court takes issue with this position for two reasons. First, the Court did not construe Equity's argument as requiring the Debtor to guarantee that she would not dismiss the case prior to the completion of the plan. Second, even if Equity did make this argument, the Court did not adopt it. In fact, the Court recognized the Debtor's right to dismiss her case under § 1307(b). *See* 249 B.R. at 178.

Additionally, the Debtor maintains that the Court's determination that she is not committing all of her disposable income to fund the plan is based upon multiple errors of law, conflicts with the *McNichols I Opinion* and is against all of the evidence.

Specifically, the Debtor argues that the Court erred by concluding that the non-debtor spouse's conduct in choosing to use his excess income to pay for luxury expenses renders the Debtor's plan not in good faith. The Debtor states that the Court failed to cite any case authority for the proposition that a decision by the non-debtor spouse to use his excess income to benefit himself and his children imputes bad faith to the Debtor's plan. In addition, the Debtor contends that the Court is requiring her to seek an injunction or restraining order against her spouse's use of his disposable income as a condition to plan confirmation.

First, the Debtor's claim that the Court is requiring her to seek an injunction or restraining order against her spouse is disingenuous. The Court never made any such statement, nor can that be implied from its Opinions. In addition, the Court did not state that the non-debtor spouse's use of his excess income to benefit himself and his children was indicative of bad faith on the Debtor's part. Rather, the Court stated:

> Moreover, from the Debtor's testimony adduced on August 18, 2000, it appears that a number of the luxury expense items found objectionable by the Trustee and Equity, as noted in the Court's prior Opinion, are continuing, though being paid by the non-debtor spouse, such as housekeeping, laundry and dry cleaning expenses, and various personal expenses for the minor children. Thus, at least in part, the Debtor is still directly or indirectly enjoying the benefits of such luxury expenditures even though they are being paid for by her spouse. While he cannot be forced to contribute his excess income over his share of the family expenses because the disposable income requirement of § 1325(b) is really directed at the Debtor's disposable income, it is not sufficient, for purposes of the good faith plan requirement of § 1325(a)(3), for the Debtor to continue to reap the benefits of her spouse's lar-

gess and only propose a plan with such a small dividend to her unsecured pre-petition creditors, who would otherwise, absent her ongoing dispute with Equity, be able to recover complete satisfaction of their claims against both or either the Debtor or her spouse.

254 B.R. at 430. Thus, the Court found that the Debtor was continuing to reap the benefits of the luxury expenses, which the Court found objectionable in the *McNichols I Opinion*, through the payment of those expenses by her spouse. The Court found that the Debtor's proposed payment of a relatively small dividend to her unsecured creditors, while continuing to reap the benefits of these luxury expenses through payment of same by her spouse, did not demonstrate good faith as required by § 1325(a)(3). It was not the non-debtor spouse's conduct in choosing to use his excess income to pay for these luxury expenses that demonstrated a lack of good faith. Rather, it was the Debtor's reaping the benefit of these expenses, coupled with the small dividend to her unsecured creditors, that the Court found was insufficient for purposes of § 1325(a)(3).

Next, the Debtor takes issue with the Court's finding that she "has not made a good faith attempt to reduce her expenses to comply with the Court's Opinion." 254 B.R. at 431. The Debtor argues that the Court's conclusion is wholly against the evidence. The Debtor maintains that the evidence showed that she did reduce her share of the non-luxury expenses to 40% from 50%, as directed by the Court in the *McNichols I Opinion*. The Debtor further argues that her spouse's failure to reduce his spending on unnecessary items is his prerogative, and the Court cannot use this fact against the Debtor, who testified, unrebutted, that she personally denied to herself the items criticized by the Court in the *McNichols I Opinion*.

Once again, the Debtor seizes upon a small portion of the language in the *McNichols II Opinion* and fails to cite other pertinent portions of that decision. The Court found the Debtor's testimony in direct contravention to her Schedules with regard to payment of camp expenses and manicures for her daughter. *See* 254 B.R. at 434. The Debtor's Schedules did not indicate that the Debtor was paying for these items. However, the Debtor testified that she did in fact make a payment for camp expenses and authorized her daughter to use her debit card for a manicure. The Debtor's testimony with respect to these two items alone demonstrates that she did not make a good faith attempt to reduce her expenses to comply with the Court's *McNichols I Opinion*. Further, the Court rejects that Debtor's argument that her spouse's payment of a housekeeper does not confer a benefit to the Debtor, but rather, only to her children and spouse. As the Court noted:

> The deleted luxury expenses from the Debtor's second amended Schedules I and J are still being enjoyed by the Debtor and her family to some extent, and the allocation of expenses between the spouses varies from the filed budget. The variances between the filed budgetary line items and who is paying what items to maintain the Debtor's lifestyle, as evidenced by her testimony and her bank statements, further demonstrates that the Debtor has actually misled this Court. Because of the Debtor's repeated failure to clear up the inaccuracies, after the various filed amendments to the plan and Schedules, the Court concludes that the Debtor's actions have been intended to mislead.

254 B.R. at 434.

In addition, the Debtor argues that her disposable income was properly computed by omitting, and thereby barring from that computation, any subtractions for luxury items. Moreover, the Debtor contends that the non-debtor spouse is permitted to spend his disposable income on whatever luxury items he chooses, particularly where they benefit him and his children and are not meant for the exclusive and deliberate benefit of his spouse. The Debtor maintains that because she has been making regular payments to the

Trustee in the sum of $1,948.00 per month, this proves that her spouse is using his disposable income to pay for the unnecessary luxury expenses.

In the *McNichols I Opinion*, the Court found that the Debtor was engaging in "a flagrant manipulation of the disposable income requirement by shifting many of those luxury expenses to the Debtor's spouse, especially where the Debtor directly enjoys the benefit of many of the luxury expenses." *See* 249 B.R. at 171. In the *McNichols II Opinion*, the Court found that the Debtor's deletion of those luxury expenses altogether took that flagrant manipulation one step further. *See* 254 B.R. at 431. The Court found the Debtor's testimony and amended Schedules inconsistent. *Id.*

The Debtor now argues that deletion of the luxury items from the Schedule J and the omission of the 401(k) monthly plan contributions from Schedule I was required by the Bankruptcy Code and the Official Forms because the purpose of Schedules I and J is to compute "excess income" which is the statutory concept of "disposable income." The Debtor contends that the ruling of this Court that such omission constituted grounds for denial of confirmation and dismissal of the case turns this principle "on its head" by requiring the inclusion, rather than the omission, of unnecessary expenses. The Debtor maintains that had she included these luxury items and the 401(k) contributions, her disposable income would have been falsely understated and that would have depressed the amount of plan payments. Specifically, the Debtor contends that if she was required to show on Schedule I the 401(k) contributions, and show the housekeeper and manicures for her daughter on the Schedule J, the amount of monthly excess income on the Schedule J would reflect only $1,010.00 instead of the $1,948.00 it currently shows.

■■■ Unfortunately for the Debtor, the Court must reject this specious argument. It is the Debtor who fails to comprehend the purpose of Schedules I and J, especially in Chapter 13 cases. As the Court stated in the *McNichols II Opinion*:

> The importance of a debtor's actual income and expenses in Chapter 13 cases cannot be overstated. The Court wholly agrees that "[p]robably the most important papers that are filed by a debtor in a Chapter 13 case are Schedules I and J, on which the current income and current expenditures of the debtor(s) are listed." 5 W. Norton, Jr., *Norton Bankruptcy Law and Practice 2d* § 116:3 at 116–10 (1997 ed.). In a Chapter 13 case, it is imperative that a debtor's Schedules I and J be reasonably accurate. The court, the trustee and the creditors must evaluate a debtor's ability to both propose and effectuate a confirmable plan based on the truthfulness and accuracy of the disclosures made in these documents.

254 B.R. at 432.

■■■ It is disingenuous for the Debtor to argue that omitting either the 401(k) plan contributions or the luxury expenses from the Schedules in computing her disposable income is proper. While her doing so may have given the false impression that she in fact maximized her share of disposable income and maximized the size of plan payments to the creditors, it was just that, a false and misleading impression. Section 1325(b)(2) defines "disposable income" as "income which ·is received by the debtor and which is not reasonably necessary to be expended . . . for the maintenance or support of the debtor or a dependent of the debtor. . . ." 11 U.S.C. § 1325(b)(2)(A). Debtors cannot pick and choose which expenses they deem reasonably necessary and list only those expenses on Schedule J. Rather, they are required to list all expenses so that courts, creditors and trustees may evaluate whether those expenses are "reasonably necessary" and ultimately whether debtors are committing all net excess disposable income beyond what is reasonably necessary for support to fund a plan. Allowing debtors to pick and choose which monthly

payroll deductions and expenses they deem worthy of being disclosed on Schedules I and J invites manipulation and something less than complete and full disclosure. What one debtor may deem an unnecessary or luxury expense, another may not. Thus, full and accurate disclosure of all income, deductions therefrom and expenses, whether debtors deem them necessary or unnecessary expenses, is required. The clear majority view is that a voluntary contribution to a retirement plan is not a reasonably necessary expense and the amount of that contribution constitutes disposable income which must be applied to a debtor's plan under § 1325(b)(1)(B). *See In re Merrill,* 255 B.R. 320, 322–23 (Bankr.D.Or.2000) (collecting cases). Debtors are "not allowed to acquire financial security for the future at the expense of [their] unsecured creditors." *Id.* at 324.

Furthermore, the Official Forms do not make exceptions for luxury expenses to be deleted in computing a debtor's current expenditures. Complete and full disclosure of all expenditures, both necessary and unnecessary or luxury or non-luxury, is mandated and required in order for courts, trustees and creditors to properly evaluate a debtor's true financial situation. The Court wholly rejects the Debtor's argument that her manipulation of these Schedules was warranted both by the Bankruptcy Code and the Official Forms themselves. Conveniently, the Debtor is unable to cite any case authority which condones this flagrant manipulation of the bankruptcy process.

Moreover, the Court notes that this is the first case before it where a debtor has concealed an ongoing gross payroll deduction for a retirement plan contribution on Schedule I, which is normally prepared directly from a debtor's payroll statements. Most disposable income disputes tend to focus on the reasonable necessity of various household expenses for debtors and their dependents as reflected on Schedule J. In most cases, the parties dispute what constitutes reasonably necessary expense to be properly reflected on Schedule J. Here, the Debtor improperly and inaccurately reported and distorted both her income and deductions therefrom on Schedule I, as well as some of the expenses on Schedule J.

Additionally, the Debtor maintains that the Court erred when it held that the Debtor's plan only proposed a 10% dividend to her unsecured creditors. The Debtor attached a two-page exhibit to this motion which purports to demonstrate that under her plan, her unsecured creditors would receive an approximate 21% dividend, co-debtor claims would receive a 22.3% dividend, and Equity's secured claim would receive full payment of its principal and $12,015.00 in interest. The Court finds this exhibit confusing and unsupported by the testimony adduced at the evidentiary hearing. Moreover, the Debtor failed to offer any narrative explanation of the exhibit, which is not self-explanatory. In the *McNichols I Opinion,* the Court reviewed the filed unsecured claims with the Trustee and the Clerk, and deemed them allowed, and then divided the amount allocated to those claims under the Debtor's third amended plan. *See* 249 B.R. at 171 n. 7. That is how the Court computed a 10% dividend to the unsecured creditors. The Court is now perplexed and unconvinced as to the basis or accuracy of the Debtor's figures contained in her exhibit.

The Debtor further contends that the Court's decision to dismiss the case under 11 U.S.C. § 1307(c)(5) was in error because the Debtor only presented two plans for confirmation, not four, and the Court failed to quote the entire text of § 1307(c)(5), which allows for dismissal of a case only after denial of a request for additional time to file another plan.

The Court previously addressed the Debtor's argument regarding the number of plans proposed and the number of confirmation hearing held. The Court need not repeat its statements again. This argument is rejected. With regard to the second prong of this argument, the Court agrees with the Debtor that it did not quote the entire text of § 1307(c)(5) when

it dismissed the Debtor's case in the *McNichols II Opinion. See* 254 B.R. at 435. However, the Court did afford the Debtor an opportunity, after it denied confirmation of her second amended plan in the *McNichols I Opinion*, to file yet another plan to correct the problems and deficiencies addressed therein. So, despite the Debtor's argument that she was not afforded any additional time to file another plan, the Court finds that she was· given this opportunity and did in fact file a third amended plan. After denying confirmation of that plan, the Court noted in relevant part that it "declines the Debtor's request to allow yet a further opportunity to propose, file and serve any further iteration of a plan. . . ." *See* 254 B.R. at 432. Hence, the Court denied confirmation of that plan and also denied the Debtor's request for "additional time for filing another plan or a modification of a plan." *See* 11 U.S.C. § 1307(c)(5). The Court will not consider the Debtor's proposed fourth amended plan attached to her reply in support of the motion at bar. At some point the process of submitting further plan versions must end. That point has been reached in this case. Accordingly, the Court did not violate § 1307(c)(5) as a matter of law and the Debtor's argument in this regards lacks merit.

## C. *Due Process Violations*

The Debtor argues that the Court denied her due process of law by: (1) failing to consider her final reply memorandum, despite being assured that her brief would have final consideration; and (2) contradicting or not providing to her guidance in the *McNichols I Opinion* on the issue of separate classification and treatment of co-debtor consumer debts. The Due Process Clause contained in the Fourteenth Amendment to the United States Constitution guarantees fair process. *See* U.S. CONST. amend. XIV, § 1. Due process requirements apply in bankruptcy cases. *See Wright v. Union Central Life Ins. Co.*, 304 U.S. 502, 518, 58 S.Ct. 1025, 82 L.Ed. 1490 (1938). The Supreme Court has held that "[a]n elemen-

tary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (citations omitted). The Debtor certainly cannot assert that she did not have notice of the pendency of the action. After all, she initiated this matter by filing the Chapter 13 bankruptcy case. Moreover, the Debtor cannot argue successfully that she did not have the opportunity to present her arguments. Extensive briefs were filed by the Debtor regarding the confirmation of her various plans and the Debtor was afforded two evidentiary hearings. She has had a full and fair opportunity to address the issues involved in the contested Chapter 13 confirmation.

Contrary to the Debtor's assertion that the Court did not consider her final reply memorandum, the Court assures the Debtor that all papers filed before it were carefully and closely reviewed and given complete and full consideration. The Debtor's assertion otherwise could not be further from the truth. That the Court did not adopt the arguments and positions of the Debtor espoused in those papers does not, ipso facto, translate into any failure to give same full and proper consideration. The failure of the Court to specifically address each and every argument or point raised by the Debtor is due to their lack of persuasion in the mind of the Court, not to mere oversight. Because inclusion equals emphasis, the Court did not incorporate all arguments in its Opinions. *See, e.g., Helm v. Helm (In re Helm)*, 49 B.R. 573, 574 (Bankr.W.D.Ky. 1985). Consequently, the Court finds that there was no intentional or "inadvertent" denial of the Debtor's due process rights. The Debtor was given a full and fair opportunity to reply to the objections made by Equity and the Trustee to confirmation of her plans. That her arguments were

rejected does not equate with a denial of her due process rights.

▮ Further, the Court rejects the Debtor's argument that she was denied her due process rights because the Court did not provide clear guidance in the *McNichols I Opinion* with respect to the issue of separate classification and treatment of co-debtor consumer debts. The Debtor maintains that the Court stated that the co-debtor must pay "his share" and then later redefined the meaning of that phrase without affording the Debtor an opportunity to respond. The Debtor fails to further clarify this point. The Court found that the Debtor's spouse had the ability to pay his share of any joint unsecured debt. *See* 249 B.R. at 176. That the Court failed to define "his share" which, as a practical matter, means the remaining portion of such claims which are unpaid by the Debtor, does not constitute the denial of the Debtor's due process rights. It is not the function of the Court to propose a Chapter 13 plan that will ultimately be confirmed. Moreover, the Court does not propose any amount that a debtor should be contributing to a plan in order to comply with the confirmation requirements of § 1325(a). Accordingly, the Court rejects the Debtor's contention that she was denied her due process rights.

## V. *CONCLUSION*

For the foregoing reasons, the Court denies the Debtor's motion to alter or amend its Memorandum Opinion and Order dated October 26, 2000.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.